Joseph E. TOLER, Appellant

v.

SÜD–CHEMIE, INC.; Jude Ware; Don Votaw; Glenn Shull; and Mike Watson, Appellees

and

Süd–Chemie, Inc., Appellant

v.

Joseph E. Toler, Appellee

2013–SC–000002–DG
2013–SC–000007–DG

Supreme Court of Kentucky.

RENDERED: DECEMBER 18, 2014

CORRECTED: APRIL 7, 2015

Rehearing Denied May 14, 2015

COUNSEL FOR JOSEPH E. TOLER: Philip Clyde Kimball, Louisville

COUNSEL FOR SÜD–CHEMIE, INC.: Oliver Barrett Rutherford, James U. Smith III, Smith & Smith Attorneys, Louisville

COUNSEL FOR JUDE WARE, DON VOTAW, GLENN SHULL, AND MIKE WATSON: Robert Matthew Colone, Louisville

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

Süd–Chemie discharged Joseph E. Toler, a veteran managerial employee, after coworkers reported he made racist comments in the workplace. Toler then sued Süd–Chemie and the coworkers for defamation. After Toler presented his evidence at trial, the trial court directed a verdict for Süd–Chemie and one of the coworkers, citing a qualified privilege to defamation. As for Toler's claims against the remaining coworkers, the jury ultimately returned a verdict in the coworkers' favor because either the statements made about Toler were true or they were not made with malice.

Toler appealed the resulting judgment, alleging the trial court erred by granting the directed verdict and by instructing the jury improperly. The Court of Appeals affirmed the jury's verdict, finding no error in the jury instructions, but reversed the directed verdict. Despite acknowledging that Süd–Chemie was entitled to the protection of a qualified privilege, the Court of Appeals, in essence, held that a plaintiff is only required to present a prima facie defamation case to overcome the qualified privilege and survive a motion for directed verdict.

Both sides petitioned for discretionary review of the opinion of the Court of Appeals, which we granted in order to clarify how the qualified privilege applies under our defamation law. We now reverse the opinion of the Court of Appeals, in part, and affirm it, in part. In reversing, we hold that a plaintiff in a defamation action opposing a directed-verdict motion made by a defendant claiming a qualified privilege must produce some evidence of the defendant's actual malice to survive a directed verdict. In affirming, we hold that the present jury instructions, while perhaps deficient, sufficiently framed for the jury's factual determination the law applicable to the case; and the jury's verdict is sound.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Süd–Chemie [1] manufactures catalysts used in various chemical operations. Toler began working for the company—then operating under a different name—in 1976 at its southern Louisville plant, one of two it operates in the area. After nearly 25 years of employment with the Company, Toler was promoted to a supervisorial role, managing the plant's night shift from 6:30 p.m. to 3:30 a.m. By all accounts, Toler excelled at his role in management until the incidents that are the subject of this litigation.

The Company's human resources director, Scott Hinrichs, received reports from some employees [2] regarding Toler's

---

1. We refer to Süd–Chemie throughout this opinion as the "Company."

2. The identities of the employees who submitted reports regarding Toler are: Mike Watson, Bob Deweese, Don Votaw, and Glen Shull. Jude Ware was also a defendant but only for his role in transcribing Shull's statement and submitting it to management, not for actually alleging Toler made racist statements. Bob Deweese died during the pen-

dency of this litigation, and his estate was not substituted; consequently, the trial court dismissed him as a defendant.

Because their identities do not bear on our analysis, we refer to the group, except for Shull, as simply "the employees." Shull's statement was unsigned, and the Company did not interview him at any point leading to Toler's termination. In fact, according to the Company, Shull's identity was not known un-

use of racist language in the workplace. Perhaps highlighting the obvious, Toler's statements were rather offensive. And Hinrichs was duty-bound under Company policy to investigate any reports of racist language because the Company had a zero-tolerance standard concerning the use of such language in the workplace.[3] Accordingly, Hinrichs reviewed the written reports submitted by the employees and then sat down with each employee to discuss the allegations.

During this investigation, the employees all acknowledged and affirmed the written statement submitted to Hinrichs. Going further, the employees were unequivocal in confirming Toler had indeed uttered the offensive statements. Hinrichs, along with the Company's plant manager, then met with Toler to receive his side of the story. At the meeting, Toler was provided with the names of the employees as well as the nature of the accusations levied against him. By Toler's account, he was not provided with the employees' actual written statements until the pretrial discovery process. Toler denied making such statements in the workplace[4] and, in an attempt to explain the employees' motive, alleged he was the target of a "union gang-up" as a result of his disagreement with another employee named Allen Trice.

The disagreement with Trice, an African–American[5] employee working under Toler, stemmed from an incident in which Trice allegedly failed to follow Toler's instruction. As a result, Toler, acting within the Company's protocol, sent Trice home. In the end, the Company terminated Trice's employment. A short time after Trice's termination, Trice filed a racial-discrimination claim with the Equal Employment Opportunity Commission. As it happens, the Company learned of Trice's EEOC complaint the day after it received the employees' written statements about Toler.[6] Members of the local workers' union, according to Toler, became upset with him over his handling of Trice. For each of the complaining employees, Toler provided an account of a disagreement that, in his view, essentially prompted a vendetta aimed at ousting him as a supervisor. The Company terminated Toler's employment the day after his meeting with Hinrichs and the Company's plant manager. Toler then filed the present case, arguing the employees had fabricated the allegations resulting in his termination and, as a result, had defamed him.

## II. ANALYSIS.

An outline of defamation law, especially the role of qualified privilege, is useful in providing context for our holding. The requisite elements for a defamation[7]

til discovery was undertaken in this case. The Company did not rely on Shull's statement in reaching its decision to terminate Toler, nor did it show the statement to Toler. Shull was dismissed from the suit along with the Company because the trial court granted a directed verdict for both, and Shull is not a party to this appeal.

3. Toler admits he was aware of this policy and Hinrichs' duty to investigate the troubling reports.

4. At trial, Toler did admit, however, that he had used racist language outside the workplace.

5. We highlight Trice's race only because it is relevant to the facts of this action. Toler is Caucasian.

6. Toler was informed of Trice's EEOC claim during this meeting with Hinrichs and the Company's plant manager.

7. We use *defamation* throughout this Opinion to include slander and libel because the former is simply oral defamation and the latter is written defamation. Generally speaking, defamation is simply a claim for injury to one's reputation.

claim are: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication [8] to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." [9] As we have repeatedly stated, "words are said to be actionable per se when there is a conclusive presumption of both malice and damage." [10] One example of this per se classification is a communication involving false allegations of unfitness to perform a job, such as here. If a communication can be labeled per se defamatory, "recovery is permitted without proof of special damages because injury to reputation is presumed and the words are actionable on their face." [11]

In certain circumstances, however, otherwise defamatory-per-se communications are allowed because the societal interest in the unrestricted flow of communication is greater than the private interest. [12] Specifically, we have recognized a privilege for individuals communicating "where the communication is one in which the party has an interest and it is made to another having a corresponding inter-

8. Because the instant defamation arises in the routine practice of employees reporting something up the organization's chain of command, publication may not appear readily detectable. *Publication* is a "term of art, and defamatory language is 'published' when it is intentionally or negligently communicated to someone other than the party defamed." *Stringer v. Wal–Mart Stores, Inc.*, 151 S.W.3d 781, 794 (Ky.2004). Toler's claim represents a rather strict reading of "publication to a third party." Essentially, the Company published the allegedly defamatory material during the meeting with Toler, Hinrichs, and the plant manager. This *technically* satisfies defamatory publication because Hinrichs discussed the material with a third party present, *i.e.* the plant manager. Of course, if Hinrichs had discussed the material with *only* Toler, there would be no "third party" present and publication would be absent. On its face, this seems highly pedantic because at the time of the meeting, Toler, Hinrichs, and the plant manager were all employees of the Company discussing matters involving the proper operation of the Company. To say the least, it is seems strange to claim the *Company* published defamatory material to a third party when all parties involved were Company agents. As noted at oral argument, it appears more like the right hand talking to the left hand. All that said, to this point in the litigation, the existence of the publication element has not been strongly questioned. Nonetheless, with regard to the Company's liability, there is support in the law for finding no publication in this situation. The concept is generally labeled "intracorporate nonpublication" and operates on the basis that "[a]gents and employees of [the same principal] are not third persons in their relations to the corporation, within the meaning of the laws pertaining to the publication of libels." *Prins v. Holland–North America Mortgage Co.*, 107 Wash. 206, 181 P. 680, 680 (1919). Kentucky has seemingly rejected this rule, finding the qualified privilege to be sufficient. *See, e.g., Dossett v. New York Min. & Mfg. Co.*, 451 S.W.2d 843, 845–46 (Ky.1970), *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 736–37 (Ky.App. 2004), *Stewart v. Pantry, Inc.*, 715 F.Supp. 1361, 1367–68 (W.D.Ky.1988). Whether we should chart a new course and adopt the concept of intracorporate nonpublication can wait for another day.

9. Restatement (Second) of Torts § 558 (1977).

10. *Stringer*, 151 S.W.3d at 794 (alterations omitted) (quoting *Walker v. Tucker*, 220 Ky. 363, 295 S.W. 138, 139 (1927)).

11. *Id.* (internal quotations omitted).

12. *See* A.G. Harmon, *Defamation in Good Faith: an Argument for Restating the Defense of Qualified Privilege*, 16 Barry L.Rev. 27, 43 (2011) ("The correct way to understand privileged occasions is to gather that they are merely conversational contexts, speech events that occur from time to time in a civilized society that, because of their beneficial purpose, are viewed with a more lenient eye when it comes to the accuracy of what is said within them.").

est."[13] Our case law has routinely applied this common-interest application of a qualified privilege to the employment context.[14] There is no dispute here that the Company and the employees operate under our recognized qualified privilege; but more than that, there can be no dispute because our law is clear.[15]

 What, then, is the impact of the qualified privilege on a plaintiff's claim of defamation per se? With defamation's confusing jargon, we have spilled much ink attempting to gain a clearer understanding of the qualified privilege and its role, seemingly to no avail. Ordinarily, because the law does not presume an individual's misconduct, the falsity of defamatory statements is presumed.[16] In addition, malice is presumed in the defamatory-per-se context. The qualified privilege, however, negates this presumption. The result: "false and defamatory statements will not give rise to a cause of action unless maliciously uttered"[17]; or, perhaps better stated, despite the law's presumption of malice "where publications are [defamatory] per se, yet where the publication is made under circumstance disclosing qualified privileges, it is relieved of that presumption and the burden is on the plaintiff to prove actual malice."[18]

 The qualified privilege is just that: qualified. Not an absolute defense, the privilege's protection can be lost through unreasonable actions amounting to abuse. Indeed, the party asserting a qualified privilege may still be responsible for falsehoods if both actual malice and falsity are affirmatively shown.[19] The qualified privilege operates to allow defendants the necessary latitude to communicate freely while maintaining accountability when the defendant operates outside of or contrary to the privilege. In this context, accordingly, *actual malice* refers to "malice in fact"—read: malevolence or ill will.[20] A defendant who enjoys the quali-

13. *Stringer*, 151 S.W.3d at 795 (quotation marks omitted).

14. *See, e.g., Dossett*, 451 S.W.2d at 845–46.

15. The determination of whether a defendant can avail itself of the qualified privilege is a question of law.

16. David A. Elder, *Kentucky Tort Law: Defamation and the Right of Privacy*, § 1.07(A) at (1983).

17. *Stewart v. Williams*, 309 Ky. 706, 218 S.W.2d 948, 950 (1949).

18. *Weinstein v. Rhorer*, 240 Ky. 679, 42 S.W.2d 892, 895 (1931).

19. *See Stringer*, 151 S.W.3d at 797. As is always the case with regard to defamation, truth remains an absolute defense even in the privilege context.

20. Not only in the briefs before this Court, but also in treatises and other scholarly publications, much has been made of the ambiguity of the term *malice*. Unfortunately, judges and lawyers are somewhat to blame because the term "is often ambiguous because it has been diluted in legal writing." Bryan A. Garner, *Garner's Dictionary of Legal Usage* (3d ed. 2011); *see also* Jonathan M. Purver, *The Language of Murder*, 14 U.C.L.A. L.REV. 1306, 1306 (1967) ("Although when used in its non-legal sense the word clearly denotes an evil or wicked state of mind, at law it does not necessarily have such a connotation; at law it simply means that the actor intentionally did something unlawful. Thus, the legal meaning of *'malice'* is confusing to a non-lawyer because an individual may act with good reason or from humanitarian motive but, as a matter of legal terminology, he has acted with *'malice'* if his act is against the law."). Without going into a great degree of detail, we agree that the various iterations of malice often breed confusion. Malice has been a pesky term in defamation nearly from the claim's inception in the English ecclesiastical courts where the claim was largely a moral one and required "redress through confession." Harmon, *supra* note 11 at 33. The presumption of malice in our defamation law is particularly problematic because malice is not a requi-

fied privilege may make defamatory statements, "unless maliciously uttered." [21] Our case law and the relevant treatises—by focusing on the utterance of the defamatory statement rather than its veracity—evidence this distinction.[22] With the qualified privilege, it is not so much *what* was said as it is *how* it was said. After all, the qualified privilege will provide protection despite a statement's falsity, assuming, of course, the privilege is not abused.

Abuse of the qualified privilege may be shown in a several ways, some indicating ill will or maliciousness more directly than others. These include: (1) "the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter"; (2) the "publication of the defamatory matter for some improper purpose"; (3) "excessive publication"; or (4) "the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged." [23]

The burden of showing such abuse of privilege is the plaintiff's.[24] Indeed, "it [ ] falls upon plaintiff to defeat this defense by a showing that either there was no privilege under the circumstances or that it had been abused." [25] Summary judgment and directed verdict remain viable options, of course. With regard to the former, "[i]f the plaintiff fails to adduce such evidence sufficient to create a genuine issue of fact, qualified privilege remains purely a question of law under the summary judgment standard." [26] As for the latter, a "directed verdict in [defendant's] favor would be appropriate despite [plaintiff's] prima facie case of defamation per se if the jury could not have reasonably found both that the statements in question were false and that [the defen-

site element of a defamation claim, per se or otherwise. Perhaps the presumption pertains to special damages, which do not require proof in a per se defamation claim. *See Louisville Press Co. v. Tennelly*, 105 Ky. 365, 49 S.W. 15 (1899) ("The word 'malice,' when used in a civil or criminal pleading in cases of this kind, does not imply, much less mean, ill will or personal malice. Its legal sense is the wrongful act done without just cause or excuse. Malice is the imputation of the law from the false and injurious nature of the charge, and differs from actual malice or ill will, which latter may be proved to enhance the damages. The legal malice need not be proven. The law imputes it to the publisher of the libel from the act of publication."). We are not required to resolve today the many vagaries and anachronisms associated with the term *malice* because the operation of malice associated with the qualified privilege is clearer than a run-of-the-mill defamation claim.

21. *Stewart*, 218 S.W.2d at 950.

22. *See, e.g., Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 275 (Ky.App.1981) (noting that the qualified privilege is "qualified by the proviso that it not be abused, *i.e.*, that whatev-

er defamation may have been spoken related solely to the investigation, that the remarks not be over-publicized, and that they not be published with malice."); *Baker v. Clark*, 186 Ky. 816, 218 S.W. 280,285 (1920) ("That a defendant would lose his right of qualified privilege if he acted malicious or in excess of the privilege, or with knowledge of the falsity of the communication, is well settled.").

23. Restatement (Second) of Torts § 596 cmt. a (1977). Of note, the final example of abuse does seem, on its face, to relate to the statement's content. Rather than illustrating abuse of the qualified privilege, a statement outside the scope of the privilege, *i.e.* not reasonably believed to be necessary for the purpose of the privilege, is better articulated as simply not entitled to the privilege in the first place. As such, the content of the statement may prove important.

24. *Weinstein*, 42 S.W.2d at 895.

25. *Columbia Sussex*, 627 S.W.2d at 276.

26. *Harstad v. Whiteman*, 338 S.W.3d 804, 811 (Ky.App.2011) (citing *Cargill v. Greater Salem Baptist Church*, 215 S.W.3d 63, 68 (Ky.App. 2006)).

dant] had [lost] any claim of privilege through abuse [or] malice."[27] To defeat a summary judgment or directed verdict motion, a party must, in essence, present the same amount of proof required if there was no privilege.

With that understanding firmly in place, we move to the specifics of the arguments presented.

### A. Directed Verdict in Favor of the Company was Appropriate.

Our directed-verdict standard of review is well settled. First of all, when presented with a motion for directed verdict, a trial court "must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion."[28] As a reviewing court, we "must ascribe to the evidence all reasonable inferences and deductions which support the claim of the prevailing party."[29]

It is the province of the jury, of course, to weigh the evidence, but a directed verdict is appropriate "where there is no evidence of probative value to support an opposite result" because "[t]he jury may not be permitted to reach a verdict upon speculation or conjecture."[30] The judgment of the trial court in such matters will only be substituted when clearly erroneous.[31] In the end, a trial court should only grant a directed verdict when "there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ."[32]

In sum, the Court of Appeals relied heavily on our *Stringer* decision to reach a conclusion where, for all intents and purposes, the plaintiff's mere assertion of falsity is sufficient to defeat a qualified-privilege defendant's directed-verdict motion. *Stringer* does stand for the proposition that, generally speaking, the determination of whether a defendant abused its qualified privilege is a question of fact properly reserved for the jury. That said, *Stringer* in no way alters the proof required for a party opposing a directed verdict motion—Toler in this case—to be successful in that opposition. Not only is the analysis undertaken by the Court of Appeals incorrect, it is especially curious in light of a published decision of that court in another opinion rendered on the same day as its opinion in the present case. That other case, *Harstad v. Whiteman*,[33] is a thorough, accurate review of our case law and the proper analytical approach to qualified-privilege defamation cases.

The Court of Appeals, in *Harstad*, made a number of important observations regarding the burden of proof carried by the plaintiff in a defamation case involving the qualified privilege. Unlike the instant action, *Harstad* involved a motion for summary judgment rather than directed verdict. Despite this slight factual distinction, the principles outlined in *Harstad* apply with equal force here. In the words of the *Harstad* Court:

"It was Harstad's burden to present some evidence that would incline a reasonable person to believe that Lowe's

27. *Stringer*, 151 S.W.3d at 798.

28. *Bierman v. Klapheke*, 967 S.W.2d 16, 18 (Ky.1998).

29. *Id.*

30. *Wiser Oil Co. v. Conley*, 380 S.W.2d 217, 219 (Ky.1964).

31. *Bierman*, 967 S.W.2d at 18.

32. *Id.* at 18–19.

33. 338 S.W.3d 804 (Ky.App.2011).

perception was not simply the product of mistaken observation, but the result of malice, i.e., some evidence that Lowe knew she was lying or making wholly unfounded statements without regard to their truth or falsity." [34]

In the instant case, Toler simply has not presented any evidence indicating the Company's malicious publication. To be sure, Toler weaves a dramatic narrative filled with collusion and rumor. But simply alleging union retaliation without any further proof cannot support a jury verdict against the Company, and, therefore, cannot defeat its directed-verdict motion. The majority of Toler's allegations revolve around the retaliatory motivations of the employees in publishing the statements to the Company, rather than any maliciousness behind the Company's publication during the meeting with Toler.

The Company, on the other hand, acted prudently within the scope of its qualified privilege by investigating the claims levied against Toler, meeting with Toler to discuss the claims, and simply enforcing a well-known, understood, and reasonable corporate policy of not permitting such offensive statements in the workplace. Toler presents no evidence that the Company excessively published the material or otherwise abused its privilege. Instead, this case presents a paradigmatic example of why the qualified privilege is recognized: society benefits when employers, or others who share common interests, are permitted to discuss matters freely, even if those discussions are found to be based on erroneous beliefs or misinformation.

Finally, Toler's argument fails because merely alleging falsity is not enough to defeat a directed-verdict motion based on the qualified privilege. As the *Harstad* Court noted, "[e]ven were we to conclude that each of these inconsistencies was both material and indicative of a specific falsehood, we could not reasonably conclude from their falsity alone that they were *malicious* utterances as opposed to mistaken observations." [35] We are in much the same position with Toler's claims. And Toler "was required to do more than assert that these statements were false; people are sometimes wrong without even suspecting it." [36] The qualified privilege, it should be remembered, requires evidence of malice in fact, *i.e.* actual malice, and "not every erroneous statement is expressed with malice." [37]

Our law has long permitted an inference of malice from the mere falsity of the alleged defamatory statements. We, of course, made mention of this in *Stringer*, granted, that mention was merely a stray quotation from an antiquated case in the conclusion of our analysis.[38] Given that the qualified privilege, "if applicable, protects one's erroneous belief[,]" [39] inferring malice from the mere falsity of the statement makes little sense. Repeatedly, it has been stated that the qualified privilege permits a defendant to "make a statement about another party *even though it*

34. *Id.* at 813.

35. *Id.*

36. *Id.*

37. *Id.*

38. "While actual malice 'requires a showing of knowledge of falsity of the defamatory statement or reckless disregard of its truth or falsity,' '[m]alice can be inferred from the fact of ... falsity.' " *Stringer*, 151 S.W.3d at 799 (internal citation omitted) (emphasis added) (quoting *Thompson v. Bridges*, 209 Ky. 710, 273 S.W. 529, 531 (1925)).

39. *Calor v. Ashland Hosp. Corp.*, 2011 WL 4431143 at *11 (Nos. 2007–SC–000573–DG & 2008–SC–000317–DG Ky. Sept. 22, 2011).

*was defamatory,* so long as he was making the statement to protect certain defined interests and he did not abuse the privilege."[40] We can acknowledge that this notion of inferring malice was prevalent in the initial development of our defamation law;[41] but the concept seems outdated in light of the law's departure from, practically speaking, strict liability and the burden of proof now associated with not only the qualified privilege, but defamation in general.[42] To the extent that *Stringer* stands for a perpetuation of allowing the mere allegation of falsity to permit an inference of malice, it is overruled. Within its scope, the qualified privilege permits defamatory statements. After all, *defame* means "to make a *false* statement about someone to a third person in such a way as to harm the reputation of the person spoken of."[43] As a result, any statement in *Stringer* to the contrary notwithstanding, both malice *and* falsity must be shown for a plaintiff to overcome the qualified privilege. Here, even if we assume Toler proved the falsity of the statements—perhaps a large assumption—he failed to prove any degree of malice.

The crux of our decision today is consistent with our holding in *Stringer.* It is worth reiterating *Stringer's* declaration that "a directed verdict in [the Company's] favor would be appropriate despite [a] prima facie case of defamation per se if the jury could not have reasonably found both that the statements in question were false and that ... any claim of privilege through abuse and/or malice" was lost.[44] This is exactly the situation today. Toler presents a per se defamation case, but his claim wilts in the face of the Company's qualified privilege because Toler has thus far been unable to present evidence to support a finding the Company acted maliciously toward him.

The abuse-of-privilege question typically is one for the jury, as are a great many determinations in tort law. But the submission of the question to the jury is not automatic. A jury is entitled to draw all reasonable inferences from the evidence, but when insufficient evidence is presented to enable a jury to infer an issue "in accordance with reason or sound thinking and within the bounds of common sense without regard to extremes or excess" a reasonable inference cannot be drawn.[45] In other words, providing evidence permitting a jury to perform mere guesswork—"making a judgment without adequate information, or to conjecture, or to speculate[ ]"[46]—does not defeat a directed-verdict motion.

The trial court's directed verdict was appropriate. Any finding of malice on the Company's part would have been nothing more than conjecture or speculation. The Company's qualified privilege may not

---

**40.** Restatement (Second) of Torts Special Note on Conditional Privileges and the Constitutional Requirement of Fault (1977).

**41.** *See, e.g., Vance v. Louisville Courier–Journal Co.,* 95 Ky. 41, 23 S.W. 591 (1893); *Evening Post Co. v. Richardson,* 113 Ky. 641, 68 S.W. 665, 667–69 (1902); *Democrat Pub. Co. v. Harvey,* 181 Ky. 730, 205 S.W. 908 (1918); *Thompson,* 273 S.W. at 531.

**42.** *See* Restatement (Second) of Torts Special Note on Conditional Privileges and the Constitutional Requirement of Fault; *Gertz v.* *Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

**43.** Bryan A. Garner, *Garner's Dictionary of Modern Legal Usage* (3d ed. 2011) (emphasis added).

**44.** *Stringer,* 151 S.W.3d at 798.

**45.** *Martin v. Commonwealth,* 13 S.W.3d 232, 236 (Ky.1999).

**46.** *Id.*

have raised the technical burden on Toler, but, certainly, like any plaintiff opposing directed verdict, Toler was required to put forth evidence sufficient to support a jury verdict founded on reason rather than emotion or prejudice. On appeal, furthermore, we are obligated to "ascribe to the evidence all reasonable inferences and deductions which support the claim of the prevailing party[.]"[47] Evidence of the Company's malicious publication is simply nonexistent. The trial court was not clearly erroneous in granting the Company's motion for a directed verdict.

**B. The Jury Instructions Were an Acceptable Statement of the Law.**

Toler's final argument seems to be hinged on a fundamental misunderstanding of *malice* in the context of defamation. Indeed, the vast majority of Toler's briefing to this Court is spent on attempting to distinguish what he terms "actual malice" from—again his words—"constitutional actual malice." This attempt not only rings hollow, but mischaracterizes the nature and purpose of our long-recognized qualified privilege for defamatory statements.

▆▆▆▆ On appeal, we consider allegations of erroneous jury instructions as questions of law to be reviewed under a de novo standard. Instructions must, of course, "be based upon the evidence[,] and they must properly and intelligibly state the law."[48] Generally, the rule is "an erroneous instruction is presumed to be prejudicial to appellant, and the burden is on appellee to show affirmatively from the record that no prejudice resulted[.]"[49] We only reverse if we "cannot determine from the record that the verdict was not influenced by the erroneous instruction."[50] That said, "[i]f the statements of law contained in the instructions are substantially correct, they will not be condemned as prejudicial unless they are calculated to mislead the jury."[51]

Long before the Supreme Court ruled in *New York Times v. Sullivan*[52] that a claim for defamation involving a public figure required proof of actual malice, our case law was clear that the qualified privilege required actual malice. Even as early as 1883, we recognized it is "well settled" that a plaintiff must show the defendant acted maliciously to defeat a claim of privilege.[53] And, as early as 1910, we approved of jury instructions defining, as the present jury instructions did, actual malice to include reckless disregard.[54] We highlight this to point out that actual malice is not a new

47. *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 821 (Ky.1992).

48. *Howard v. Commonwealth*, 618 S.W.2d 177, 178 (Ky.1981).

49. *Drury v. Spalding*, 812 S.W.2d 713, 717 (Ky.1991) (quoting *Prichard v. Kitchen*, 242 S.W.2d 988, 992 (Ky.1951)).

50. *Id.*

51. *Ballback's Adm'r v. Boland–Maloney Lumber Co.*, 306 Ky. 647, 208 S.W.2d 940, 943 (1948).

52. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There is no dispute that this case does not involve a public figure and does not implicate the First Amendment concerns articulated in *Sullivan*. Instead, this case is simply a private-plaintiff-versus-private-defendant defamation action.

53. *Nix v. Caldwell*, 81 Ky. 293, 297 (1883) ("It is well settled, where the common protection and welfare of society requires that the communication should be made, that when made, if in the absence of actual malice, it must be regarded as privileged....").

54. *Tanner v. Stevenson*, 138 Ky. 578, 128 S.W. 878, 883 (1910) ("[T]he defendant was prompted by actual malice, that is, actual ill will or hatred on the part of the defendant toward plaintiff, or a reckless disregard of the plaintiff's rights by the defendant,....").

concept in the law and *Sullivan* did little to change its application outside of raising the standard of proof in public-figure cases to clear-and-convincing evidence.

 If anything, the jury instructions were clumsily arranged.[55] This clumsy arrangement did not, however, misstate the law in any substantial manner nor was it calculated to mislead the jury. The jury instructions required the jury to find actual malice, which as we detailed earlier is, in this context, simply malice in fact. The definition of *actual malice* in the instructions is entirely in line with this view:

> To prove 'actual malice,' a Plaintiff must prove that the speaker either (1) knew the statement was false at the time it was made or (2) acted with 'reckless disregard' as to whether the statement was true or false. 'Reckless disregard' means the speaker either (1) entertained serious doubts as to the truth or falsity of the statements or (2) had a high degree of awareness as to whether the statement was probably false.

Based on what we have stated in this opinion, we are unable to find this instruction qualifies as a substantial misstatement of the applicable law. It is entirely accurate that Toler was required to show the

employees, in publishing the statements to the Company, acted with actual malice toward Toler in order to overcome the qualified privilege. The instruction accurately defines actual malice for defamation purposes. In point of fact, the instruction essentially parrots the language of the Restatement (Second) of Torts § 600 Comment b, an invaluable resource that has been repeatedly cited and relied on throughout the development of our defamation case law.[56]

Of course, abuse of the qualified privilege can be shown in more ways than reckless disregard for the truth or falsity of the statement. Toler argues the instructions should have reflected all permutations of abuse.[57] Perhaps "[a] proper instruction would reflect the relevant category of 'abuse' applicable in a given case[,]"[58] but we are unable to find the instant instructions deficient such that we should overturn the jury's verdict. More importantly, Toler did not argue the other areas of abuse, *e.g.* excessive publication or publication unnecessary for purpose of privilege.

 Toler did, however, argue the employees acted with an improper motive; and the jury should have been instructed accordingly. The instructions, on their

---

55. Truth is always a complete defense to defamation. The jury instructions in issue here, however, are arranged in such a manner that it is difficult to determine exactly why the jury found the employees not liable. The jury was asked simply to answer "yes" or "no" to whether the employees' statements were false, made by the employees without exercising ordinary care to determine whether the statements were true or false, and made by the employees with actual malice. The jury answered "no." Because the jury was not asked to answer separately regarding each aspect of liability, we cannot say with certainty that the jury found the employees' statements true. As a result, we are unable to affirm the verdict on that ground.

56. Restatement (Second) of Torts § 600 cmt. b (1977).

57. We can dismiss out of hand Toler's argument that a jury should be allowed to find the qualified privilege defeated on an inference of malice from the falsity of the statements. Our discussion on the Company's directed verdict and the nature of the qualified privilege puts this argument to rest.

58. *Calor v. Ashland Hosp. Corp.,* 2011 WL 4431143 (Nos. 2007–SC–000573–DG & 2008–SC–000317–DG Ky. Sept. 22, 2011).

face, do seem to omit any mention of improper motive, which was present in Toler's proposed jury instructions. But the instructions do provide the jury with the ability to draw an improper-motive inference. The jury was asked to determine if the statements were false and if they were made with actual malice, defined in such a manner as to include knowing the statements were false or being aware of a high probability of falsity. If the jury believed the statements were false and the employees published the statements either knowing of the falsity or with a high probability they were false, the jury would have, in essence, found the employees operated with an improper motive. In that situation, the purpose behind the employees' publishing the statements would not have been consistent with the common-interest qualified privilege, and the jury could have found liability. Rather than publishing the statements because of a common interest in a cohesive workplace, the employees would have operated with an apparent vendetta against Toler. The jury did not find this to be the case.

While not explicit, the instructions sufficiently include Toler's requested improper motive. Even if we were to assume the omission of improper motive was erroneous, the error would undoubtedly be harmless because of the jury's finding. In total, the instructions given to the jury provided a sufficient statement of the law, and we are unwilling to invade the province of the jury and overturn their finding.

### III. CONCLUSION.

Simply put, Toler has failed to produce any evidence tending to show that the Company acted toward him with malice. Accordingly, in light of the Company's qualified privilege, we reverse the opinion of the Court of Appeals and reinstate the trial court's directed verdict in favor of the Company. The defamation claim against the employees, on the other hand, was properly submitted to the jury. The instructions provided to the jury sufficiently stated the law with regard to malice. We find no error with Toler's trial. The Court of Appeals is reversed in part, affirmed in part, and the trial court's judgment is reinstated.

All sitting. All concur.