RENDERED: MAY 3, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1431-MR

CSX TRANSPORTATION, INC.                                APPELLANT

APPEAL FROM GREENUP CIRCUIT COURT
v.          HONORABLE JOHN F. VINCENT, JUDGE
ACTION NO. 18-CI-00348

DANIEL J. CAREY, II, D.C.; CAREY
CHIROPRACTIC AND
REHABILITATION, INC.; AND
SHANNON M. JOHNSON, D.C. D/B/A
JOHNSON CHIROPRACTIC                                APPELLEES

AND

NO. 2022-CA-1477-MR

CRAIG HELIGMAN, M.D.                                APPELLANT

APPEAL FROM GREENUP CIRCUIT COURT
v.          HONORABLE JOHN F. VINCENT, JUDGE
ACTION NO. 18-CI-00348

DANIEL J. CAREY II, D.C.; CAREY
CHIROPRACTIC AND
REHABILITATION, INC.; AND

SHANNON M. JOHNSON, D.C. D/B/A
JOHNSON CHIROPRACTIC                                                APPELLEES


OPINION
VACATING AND REMANDING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; KAREM AND MᴄNEILL, JUDGES.

THOMPSON, CHIEF JUDGE:  CSX Transportation, Inc. and Dr. Craig Heligman

appeal from a judgment of the Greenup Circuit Court which found that the

appellants had defamed the appellees.  Appellants raise numerous issues on appeal.

After reviewing the record and the law, we conclude that the trial court made two

errors regarding the jury instructions and one evidentiary error.  We also conclude

that Dr. Heligman was not properly served in this action and should have been

dismissed from the case.  We vacate and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

In 2017, Dr. Heligman was the Chief Medical Officer of CSX.  One of

Dr. Heligman's responsibilities was to receive Certificates of Ongoing Injury or

Illness (COII) forms.  These forms would be sent to Dr. Heligman's office from

medical practitioners and would indicate that a CSX employee would need time off

from work due to injury or illness.  Over several weeks in June of 2017, Dr.

Heligman received COIIs for around seventy employees at CSX's Huntington,

-2-

West Virginia mechanical facility. These COIIs were almost identical and came from two chiropractic practitioners, Dr. Daniel Carey and Dr. Shannon Johnson. The COIIs indicated that the employees had sustained musculoskeletal injuries outside of work and would need two months off to recover. Dr. Heligman testified that the amount of COIIs coming from two practitioners in that time frame was unusual. The COIIs were also received around the same time that furloughs were to be announced for that area.

When an employee is furloughed, CSX pays their health and welfare benefits. Also, the Railroad Retirement Board (RRB), a federal agency, pays the furloughed employee 60% of his or her compensation, and a private insurance plan through Aetna pays the other 40% of the furloughed employee's compensation. Normally, a furloughed employee receives four months of benefits and compensation; however, an employee who was on medical leave at the time of being furloughed can receive up to two years of benefits and compensation.

Dr. Heligman believed the high number of COIIs received around the time of the furlough announcement was suspicious. He drafted a letter, dated July 14, 2017, and sent it to the Office of the Inspector General of the RRB. This letter is the basis for the underlying lawsuit; therefore, we will include it in this Opinion. The letter stated as follows:

> I [am] writing to inform you of my concern about the
> practices of two chiropractic physicians that provide

services to CSX employees in the Huntington, WV area. They have both provided services in the region for a long time, and we have received numerous documents from them in the course of our normal review of medical fitness for duty issues related to our employees. In the past; we had suspicions that the providers were removing our employees from work inappropriately and potentially in relationship to business changes in the region that may have resulted in furloughs or reduced work hours. It was thought that the employees were reporting injuries while off duty and seeking out these providers for the purpose of inappropriately seeking benefits to offset potential wage losses.

In my professional medical opinion, both of these providers continued to keep employees off work for much longer than is medically appropriate. These conditions would be considered minor musculoskeletal injuries that generally would resolve without any treatment, without more than a few weeks away from work, or with no more than a couple of weeks of chiropractic care. Therefore, their practices are also highly suspicious for excessive and inappropriate treatment.

Although we had suspicions, we were not able to identify patterns that were clearly fraudulent. Recently, we had a significant change in business in the area with facility closures and work reductions. Concurrent with the announcing of these business changes, we received doctor's notes withholding over fifty employees from work between June 19 and July 12, 2017. The list of employees has been expanding daily.

In my opinion, the timing of these alleged injuries and the volume of cases that spiked just at this time is highly suspicious and suggestive of fraudulent practices on the part of both the employees and these two providers. I have attached a list of the employees who have submitted notes in the time period identified. Some are extensions

of cases started several months to a year earlier, some have no prior events in our records, and a few had recently been cleared to work by these providers but coincidentally had recurrences at the time the business changes were announced. However, all forms were submitted within the same short time period.

The two providers of concern are: [Shannon Johnson and Daniel Carey.]

I strongly urge you to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors. I will also be notifying the appropriate licensing boards and health insurance companies so that they may initiate their own investigations.

Please do not hesitate to contact me for any additional information that may be of assistance in your investigation.

Included with the letter was a list of employees who had received medical care from Drs. Carey and Johnson. An identical letter was sent to the Fraud, Waste, and Abuse Investigations Departments of the following insurance companies: Aetna, Inc., Highmark Blue Cross Blue Shield, and United Health Care. In addition, the letter was sent to the Kentucky and Ohio Chiropractic Boards. About a month after the letter was sent, CSX informed its employees and Appellees that it would no longer accept COIIs from Appellees.

On July 12, 2018, Appellees brought the underlying cause of action. Appellees sued Appellants for defamation *per se*, based on the allegations in the letter, and for tortious interference with prospective economic advantage, based on

refusing to accept COIIs from Appellees.[1]  Appellees also sought punitive damages.[2]

On August 8, 2018, Appellants removed the case to the United States District Court for the Eastern District of Kentucky.  In its notice of removal, Appellants claimed that Dr. Heligman, along with other individually named defendants, had not been served in the matter.  Dr. Heligman later moved to be dismissed from the case for failure to perfect service.  In January of 2019, the federal case was remanded to the Greenup Circuit Court for lack of federal jurisdiction.  The service issue was not resolved before remand.  After remand, counsel for Appellees requested that counsel for CSX accept service on behalf of Dr. Heligman and the other defendants who claimed to have not been served.  CSX's counsel declined.  Appellees did eventually serve some of the other defendants, but did not serve Dr. Heligman.

Motion practice and discovery then commenced in the circuit court for the next four years.  During that time, motions for summary judgment were made and Dr. Heligman again raised the lack of service issue.  Other than dismissing the other named defendants, the motions for summary judgment were denied.  In

---

[1] CSX did not refuse to allow employees to see or treat with Appellees; however, refusing to accept COIIs from those doctors had the effect of stopping employees from treating with those doctors.

[2] Other defendants were named in the lawsuit and an additional claim was raised; however, the other defendants were dismissed prior to trial and the other claim was dismissed during trial.

addition, the court ruled that, even though Dr. Heligman was not properly served, he had responded to a request for admissions during the discovery period; therefore, he waived the service issue.

A three-day jury trial was held on September 19, 21, and 22 of 2022. At the end of the trial, the jury returned verdicts in favor of Appellees. The jury awarded Dr. Carey and Dr. Johnson $350,000 each on the defamation claim. The jury also awarded Dr. Carey $260,000 for the tortious interference claim. Dr. Johnson received $455,000 for that claim. The jury also awarded Dr. Carey and Dr. Johnson $10.7 million each in punitive damages. Appellants filed motions to alter, amend, or vacate, in which Dr. Heligman again raised the service issue. The court denied the motions and specifically found that Dr. Heligman's interests had been protected during the beginning stages of the case by CSX and its counsel. These appeals followed.

## ANALYSIS

Appellants' first argument on appeal is that the trial court erred in not granting summary judgment or a directed verdict in their favor for the defamation claims. Appellants claim that Dr. Heligman's letter was pure opinion and the statements therein were absolutely privileged.

> Defamation is, generally, "the injury to the reputation of a person in public esteem." A prima facie case of slander, or [] defamation, requires proof of four elements: (1) defamatory language, (2) about the

plaintiff, (3) which is published, and (4) which causes injury to reputation. The alleged defamatory words must be construed in their most natural meaning and "measured by the natural and probable effect on the mind of the average [listener]."

*Cromity v. Meiners*, 494 S.W.3d 499, 502 (Ky. App. 2015) (citations omitted).

[A] defamation claim may be defeated by assertion of a "privilege." A privilege is recognized as a defense to a defamation claim; the defense may be either absolute or qualified. An absolute privilege affords a defendant a complete defense to a claim of defamation; whereas, a qualified privilege only affords a defendant a conditional defense to a claim of defamation.

*Smith v. Martin*, 331 S.W.3d 637, 640 (Ky. App. 2011). We review defamation privilege issues *de novo*. *Id.*

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory fact as the basis for the opinion.

The key distinction is between statements which are "pure" opinion and statements which are "mixed" expressions of opinion.

"Pure opinion, which is absolutely privileged, occurs where the commentator states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is clearly based. In contrast, the mixed type is apparently based on facts regarding the plaintiff or his conduct that have not been

-8-

> stated by the defendant or assumed to exist
> by the parties to the communication."

> With mixed opinion, the defendant is subject to liability
> if the listener draws the reasonable conclusion that the
> opinion expressed by the speaker must have been based
> on undisclosed defamatory facts.

*Cromity*, 494 S.W.3d at 502-03 (citations omitted). "It is an elementary principle of the law of libel that the defamatory matter complained of should be construed as a whole." *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981) (citations omitted).

Here, Appellants argue that Dr. Heligman's letter was pure opinion and absolutely privileged because the letter used words like "potential conspiracy to defraud" and "in my opinion." In addition, Appellants claim that the letter included the facts that substantiated the opinion, the list of names of employees who treated with Drs. Carey and Johnson. Appellants argue they were entitled to summary judgment or a directed verdict and the defamation claim should not have gone to the jury.

The trial court believed there were issues of fact that needed to be determined by the jury and absolute privilege did not apply. We agree with the trial court because the letter was not an example of pure opinion, but mixed opinion. While the letter did use opinion-like statements, such as "potential" and "in my opinion," it also claimed that the doctors were keeping employees off work

longer than necessary and that they were providing "excessive and inappropriate treatment." This was an allegation of fraudulent and unethical activity, but the letter provided no facts or evidence to support this claim. Additionally, the letter indicated that Drs. Carey and Johnson might be involved in a conspiracy with some employees to fraudulently receive extended benefits. While the letter did include a list of employees who treated with those doctors, this is not, by itself, strong factual evidence of inappropriate activity. In summary, the letter provided allegations of fraudulent activity on the part of the doctors, but did not support those allegations with facts.

Examining the letter as a whole, it would not be unreasonable for the reader of the letter to assume the allegations were based on undisclosed facts. While the letter used terms and phrases suggesting it was pure opinion, there were no facts to support the claims raised. Dr. Heligman testified that, at the time he wrote his letter, he had no evidence of a conspiracy, no statistical evidence to suggest the spike in COIIs was unusual, and that he had no reason to doubt the truthfulness of the information supplied by the COIIs. Dr. Heligman's letter provided little to no factual support for his statements; therefore, this was not a case of pure opinion and the trial court did not err in allowing the jury to decide the issue.

Appellants' next argument is that, even if the letter was not pure opinion, it was still entitled to qualified privilege.

> In certain circumstances . . . otherwise defamatory-per-se communications are allowed because the societal interest in the unrestricted flow of communication is greater than the private interest. Specifically, we have recognized a privilege for individuals communicating "where the communication is one in which the party has an interest and it is made to another having a corresponding interest."

*Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 282-83 (Ky. 2014), *as corrected* (Apr. 7, 2015) (footnotes and citations omitted). This is qualified privilege.

> What, then, is the impact of the qualified privilege on a plaintiff's claim of defamation per se? . . . Ordinarily, because the law does not presume an individual's misconduct, the falsity of defamatory statements is presumed. In addition, malice is presumed in the defamatory-per-se context. The qualified privilege, however, negates this presumption. The result: "false and defamatory statements will not give rise to a cause of action unless maliciously uttered"; or, perhaps better stated, despite the law's presumption of malice "where publications are [defamatory] per se, yet where the publication is made under circumstance disclosing qualified privileges, it is relieved of that presumption and the burden is on the plaintiff to prove actual malice."

> The qualified privilege is just that: qualified. Not an absolute defense, the privilege's protection can be lost through unreasonable actions amounting to abuse. Indeed, the party asserting a qualified privilege may still be responsible for falsehoods if both actual malice and falsity are affirmatively shown. The qualified privilege operates to allow defendants the necessary latitude to communicate freely while maintaining accountability

-11-

when the defendant operates outside of or contrary to the privilege. In this context, accordingly, *actual malice* refers to "malice in fact" – read: malevolence or ill will. A defendant who enjoys the qualified privilege may make defamatory statements, "unless maliciously uttered." Our case law and the relevant treatises – by focusing on the utterance of the defamatory statement rather than its veracity – evidence this distinction. With the qualified privilege, it is not so much *what* was said as it is *how* it was said. After all, the qualified privilege will provide protection despite a statement's falsity, assuming, of course, the privilege is not abused.

Abuse of the qualified privilege may be shown in a several ways, some indicating ill will or maliciousness more directly than others. These include: (1) "the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter"; (2) the "publication of the defamatory matter for some improper purpose"; (3) "excessive publication"; or (4) "the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged."

The burden of showing such abuse of privilege is the plaintiff's. Indeed, "it [ ] falls upon plaintiff to defeat this defense by a showing that either there was no privilege under the circumstances or that it had been abused."

*Id.* at 283-84 (footnotes and citations omitted) (emphasis in original).

Here, Appellants submitted a proposed jury instruction to the court regarding qualified privilege. The court declined to give the instruction because it found that Dr. Heligman sent the letter to inappropriate entities, namely the

-12-

insurance companies and the licensing boards.[3]  The court believed Appellants were not entitled to the instruction due to the evidence presented.

We have two standards of review for jury instruction issues.  "When the question is whether a trial court erred by:  (1) giving an instruction that was not supported by the evidence; or (2) not giving an instruction that was required by the evidence; the appropriate standard for appellate review is whether the trial court abused its discretion."  *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015), *overruled on other grounds by University Medical Center, Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021).  We can also review jury instructions *de novo* when the issue is "the substantive content of the jury instructions[.]"  *Id.* at 204.  In other words, if a judge decides to give a jury instruction, we review the instruction *de novo* to determine if the instruction correctly sets forth the law.

We believe the trial court erred as to this issue because the evidence supported giving the qualified immunity instruction.  As this concerns an erroneous decision regarding whether to give an instruction, we review for an abuse of discretion.  *Id.* at 203.  "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."  *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).  We believe the trial court erred in finding that Dr. Heligman sent the letter to

---

[3] In other words, the court found "excessive publication."

inappropriate entities. Dr. Heligman testified that, at the time he wrote the letter, he was suspicious that Appellees were engaged in fraudulent activity. He then sent the letter to those entities who could investigate this alleged suspicious activity and asked for such an investigation. All of the entities had a common interest in determining if Appellees were committing fraud. *Toler*, 458 S.W.3d at 282-83. The RRB and Aetna both paid benefits to employees; therefore, they would be interested to know if these benefits were being unjustly provided. The other insurance companies would also be interested to know if their insureds were receiving unnecessary treatment, leading to unnecessary insurance payments to Drs. Carey and Johnson. Finally, the licensing boards of Kentucky and Ohio would be interested in knowing if two doctors that they license were engaged in unethical activity. These interests correspond with the interests of Dr. Heligman and CSX, to determine whether or not CSX employees were trying to defraud the benefits system, a portion of which CSX pays for, with the help of Drs. Carey and Johnson.

Appellants were entitled to raise the issue of qualified privilege. Appellees were then required to show that there was actual malice in the publishing of the letter or that the privilege was abused. *Id.* at 283-84. Whether Appellees can defeat this privilege will require an examination of the facts and should have been given to the jury to determine. *Columbia Sussex Corp., Inc. v.*

-14-

*Hay*, 627 S.W.2d 270, 276 (Ky. App. 1981). Because the trial court erred in not allowing Appellants to utilize the qualified privilege defense, a new trial is warranted on this issue.[4]

Appellants' next argument on appeal is that they are entitled to a judgment on the tortious interference with prospective economic advantage claim.[5] In the alternative, they argue they are entitled to a new trial on the issue. Appellants claim that they had a legitimate reason to stop accepting COIIs from Appellees, namely, to stop benefits fraud.

> Tortious interference with [prospective economic advantage] requires: (1) the existence of a valid business relationship or expectancy; (2) that the defendant was aware of this relationship or expectancy; (3) that the defendant intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages. Tortious interference with [prospective economic advantage] does not require the existence of a contract. Interference which prevents the making of future contracts is the equivalent of interference which induces the breach of an existing contract.
>
> [I]t is clear that to prevail [on a claim for tortious interference with prospective contractual relations/business advantage] a party seeking recovery must show malice or some significantly wrongful conduct. The context and the course of the decisions

---

[4] In a post-trial order, the court indicated that the privilege was not available to Appellants because there was no common interest between CSX, Dr. Heligman, and the recipients of the letter. While this is a different reason as stated by the court at an earlier time, we have discussed why we believe there was a common interest.

[5] Also known as tortious interference with business relations and tortious interference with prospective contractual relation.

make it clear that what is meant is not malice in the sense of ill will but merely intentional interference without justification. This analysis turns primarily on motive.

*PBI Bank, Inc. v. Signature Point Condominiums LLC*, 535 S.W.3d 700, 715 (Ky. App. 2016) (internal quotation marks and citations omitted).

Our law is clear that a party may not recover under the theory presented in the absence of proof that the opposing party "improperly" interfered with his [prospective economic advantage]. To determine whether the interference is improper, [Restatement (Second) of Torts § 767 (1979)] sets forth seven factors to be considered by the court in ruling on the motion for directed verdict and, if the case is submitted, considered by the jury. Unless there is evidence of improper interference, after due consideration of the factors provided for determining such, the case should not be submitted to the jury. Even if evidence is presented which would otherwise make a submissible case, the party whose interference is alleged to have been improper may escape liability by showing that he acted in good faith to assert a legally protected interest of his own. While the party seeking recovery bears the burden of proving that the interference was improper, the party asserting a right to protect his own interest bears the burden of proving his defense.

*National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 858 (Ky. 1988). Those seven factors are:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

-16-

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

RESTATEMENT (SECOND) OF TORTS § 767 (1979).

Appellants argue that they provided evidence that they were seeking to protect their own interests and that their motive was not improper. Appellants cite to *Hornung*, *supra*, and *Cullen v. South East Coal Co.*, 685 S.W.2d 187 (Ky. App. 1983), for the proposition that protecting one's health care plan from fraudulent activity is a legitimate business interest. Appellants argue as that is what they were doing in this case, they were acting in good faith.

Appellants are correct that this Court in *Cullen* found that protecting a health care plan is a legitimate business interest. *Id.* at 190. If that is the case, it is not so far-fetched to believe Appellants' actions were also a legitimate business interest. Appellants testified that they believed there could be a fraud being perpetrated by Appellees and were seeking to protect their benefits system. Here, the trial court gave the jury an instruction on the tortious interference with prospective economic advantage claim, but did not include anything regarding the protecting of a legitimate business interest. Appellants requested the legitimate

business interest issue be included in the jury instructions, but the trial court believed it was not necessary to include that language.

First, we do not believe Appellants were entitled to summary judgment or a directed verdict on the tortious interference claim. There was sufficient evidence to give the issue to the jury because CSX stopped accepting COIIs from Appellees and Appellees put on evidence that this was based on no more than a hunch. In addition, evidence was presented at trial that some of the investigative bodies who received Dr. Heligman's letter informed Appellants that, after reviewing the situation, they found no wrongdoing. Despite this notification, CSX continued to refuse to accept COIIs from Appellees. This issue properly went to the jury because there were material issues of fact that required a jury decision.

We also believe, however, that Appellants properly requested the good faith "protecting a business interest" language be included the jury instruction. As this issue concerns a potentially incorrect jury instruction, we review it *de novo*. *Sargent*, 467 S.W.3d at 204. We believe that the trial court erred in not including the "protecting a business interest" defense in the jury instruction. Based on *Cullen* and the evidence provided at trial, this should have been included. *Cullen* held that protecting an employee health plan was a legitimate business interest that could be protected and some evidence indicated

-18-

Appellants believed they were protecting CSX's interests. Whether Appellants' actions were done in good faith is a factual one that should have been decided by the jury. This issue also requires a new trial due to this error.

Appellant's next argument on appeal is that the trial court erred in excluding evidence regarding the employee disciplinary process. The CSX employees that Appellants believed might be trying to defraud the company were given hearings in front of a board. The employees were entitled to this hearing pursuant to their collective bargaining agreement. These hearings were similar to arbitration and allowed CSX and the employees to show what evidence was gathered during the investigation and what actions CSX took. At the conclusion of the hearings, some employees were terminated from their employment for dishonesty. Appellants sought to introduce the outcomes of the hearings into evidence to help prove that Dr. Heligman was right to be suspicious.[6]

The trial court excluded the evidence of the outcome of the hearings because they happened long after Dr. Heligman wrote his letter. The trial court believed that the only evidence that was relevant was what was known at the time the letter was written. In other words, the truthfulness of the statements in Dr.

---

[6] The trial court allowed Appellants to present evidence of the internal investigation performed by CSX, but not evidence of the outcome of the hearings.

Heligman's letter and the reasonableness of CSX's actions had to be judged at the time they were made.

The proper standard for review of evidentiary rulings is abuse of discretion. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). We do not believe the trial court erred here. We agree that the outcomes of the hearings are irrelevant because they had no bearing on Dr. Heligman's letter or what he and CSX believed at that time. The court's decision was reasonable.

Appellants also argue that the court erred in revealing to the jury CSX's operating income. At the close of evidence, the judge stated to the jury, "in 2017, the defendant, CSX Transportation, reported operating income of $3,325,000,000." This was part of a stipulation produced during discovery. That number was then used by Appellees to try and justify a large punitive damages award.

"It has been the law of this Commonwealth for almost one hundred years that in an action for punitive damages, the parties may not present evidence or otherwise advise the jury of the financial condition of either side of the litigation." *Hardaway Management Co. v. Southerland*, 977 S.W.2d 910, 916 (Ky. 1998) (footnote and citations omitted).

> [N]o evidence as to the financial condition of either
> defendant or plaintiff should be admitted in any case in
> which punitive damages might be recovered because
> [t]he tendency of this class of testimony would be to lead

the jury to consider chiefly the pecuniary condition of the defendant, rather than the enormity or wantonness of the act for which punitive damages might be allowed.

*Sand Hill Energy, Inc. v. Smith*, 142 S.W.3d 153, 167 (Ky. 2004) (footnote, citation, and internal quotation marks omitted).

The issue here revolves around an apparent miscommunication. It is not entirely clear from the record, but, after reviewing statements made by the parties' attorneys on the record, it appears as though Appellees thought they were asking CSX for information regarding its profits for 2017, but CSX believed Appellees were asking for its operating income. What is clear from the record is the stipulation itself, which we have reviewed. The stipulation states that the 2017 operating income was $3,325,000,000. The stipulation also states that this was agreed to by the parties, but that CSX "does not stipulate to the admissibility of this information at trial." In other words, CSX gave Appellees the information they requested; however, disputed whether it could be used at trial.

This issue is relevant because Kentucky Revised Statutes (KRS) 411.186(2)(c) states that the "profitability of the misconduct to the defendant" is a factor to be considered when determining punitive damages. We believe the trial court erred in this instance. CSX's operating costs are not similar to the profitability of the alleged misconduct in this case. Based on the wording of the stipulation, KRS 411.186(2)(c), and the cases cited above, it was an abuse of

discretion to read this stipulation to the jury.  The court shall take this into account on remand.

Appellants also raise issues regarding the punitive damages awarded in this case.  As we are vacating the judgment and remanding for a new trial, we decline to address these issues as they may not appear again on remand.

The final issue we must discuss concerns the service of process for Dr. Heligman.  There is no dispute that Dr. Heligman was not served with a summons or complaint at the beginning of this case.  Even the trial court acknowledged this in a pre-trial hearing and a post-trial order; however, the court believed Dr. Heligman waived the issue by responding to a request for admissions. The question we must answer is, did Dr. Heligman waive this defense?

Kentucky Rules of Civil Procedure (CR) 12.02 states in relevant part:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:  (a) lack of jurisdiction over the subject matter, (b) lack of jurisdiction over the person, (c) improper venue, (d) insufficiency of process, (e) insufficiency of service of process, (f) failure to state a claim upon which relief can be granted, and (g) failure to join a party under Rule 19.  A motion making any of these defenses shall be made before pleading if a further pleading is permitted.  No defense or objection is waived by being joined with one or more defenses or objections in a responsive pleading or motion.

CR 12.08(1) states:

> A defense of lack of jurisdiction over the person,
> improper venue, insufficiency of process, or
> insufficiency of service of process is waived . . . if it is
> neither made by motion under Rule 12 nor included in a
> responsive pleading or an amendment thereof permitted
> by Rule 15.01 to be made as a matter of course.

Dr. Heligman first raised the lack of service defense when the case was removed to the federal court. The motion for removal to federal court noted that Dr. Heligman had not been served and Dr. Heligman later made a motion to dismiss based on lack of service. Unfortunately, that court did not rule on the issue. In addition, after remand from the federal court, the attorney for CSX refused to accept service on Dr. Heligman's behalf.

Dr. Heligman also raised the issue four times before the Greenup Circuit Court: in a motion for summary judgment, in a pre-trial memorandum, in his answer, and in a post-trial motion to alter, amend, or vacate. It appears to this Court that Dr. Heligman informed Appellees and both courts that he had not been served.

Appellees argue that Dr. Heligman waived service by filing an expert witness disclosure and answering a request for admissions. These two acts occurred after remand to the circuit court and during discovery, but before he raised the service issue again via a motion. We believe, based on the specific facts of this case, there was no waiver. Taking additional steps after raising an

insufficiency of service of process defense does not waive that defense. *See Weant's Adm'r v. Ellis*, 287 S.W.2d 446, 448 (Ky. 1955). Here, Dr. Heligman raised the issue with the federal court and made his defense known. Only after this did he file an expert witness disclosure list and submit answers to a request for admissions.

In addition, we do not believe an expert witness disclosure would be a pleading that would need to raise the defense as required by CR 12.02 and CR 12.08. A pleading is defined as: "A formal document in which a party to a legal proceeding (esp. a civil lawsuit) sets forth or responds to allegations, claims, denials, or defenses." *Pleading*, BLACK'S LAW DICTIONARY (7th ed. 1999). A responsive pleading is defined as: "A pleading that replies to an opponent's earlier pleading." *Id.* The witness disclosure in this case was filed pursuant to a scheduling order by the trial court. We do not consider this a responsive pleading. *See First Nat'l Bank of Cincinnati v. Hartman*, 747 S.W.2d 614, 616 (Ky. App. 1988) ("An agreed order of dismissal is not a responsive pleading in which a failure to raise a defense would thereby waive it.").

As for the request for admissions, these were not filed with the court until after Dr. Heligman again raised the service of process issue before the circuit court via a motion for summary judgment. Appellees sent the request for admissions to counsel for CSX via email and counsel for CSX returned them to

Appellees the same way. Counsel for CSX also noted an objection to the admissions because they were not properly served to the parties, not signed by an attorney for Appellees, and not filed with the court.[7] Although counsel for CSX did not raise the original insufficiency of service of process defense here, we consider the other objections relevant.

We believe that the expert witness disclosure and the response to the request for admissions did not waive the insufficiency of service of process defense. First, continuing to defend yourself in court after raising the defense does not waive it. *Ellis*, *supra*. Second, we conclude that the witness disclosure in this case was not a responsive pleading that would require a defendant to raise the service of process issue. *Hartman*, *supra*. Third, the request for admissions were not filed with the court, properly served upon Dr. Heligman, and were objected to.

Dr. Heligman raised the service of process issue early in the case before the federal court and then again in the circuit court. Any participation of Dr. Heligman in these proceedings was done, as his trial counsel stated, "out of an abundance of caution" so that he would not lose out on his rights while he argued

---

[7] We note that we could not find the original, unanswered request for admissions in the record. We only had access to the request for admissions after they were answered; therefore, we cannot verify whether the request was signed by an attorney for Appellees. What we can verify is that it was not properly served to Dr. Heligman, as it was sent to counsel for CSX, and was not filed with the court.

the service of process issue.  This issue was not waived and the trial court erred in not dismissing him from the case.

## **CONCLUSION**

Based on the foregoing, we vacate the judgment of the Greenup Circuit Court and remand for a new trial.  On remand, Dr. Heligman should be removed from the case due to lack of service of process.  In addition, CSX should be allowed to pursue the qualified privilege defamation defense and the "protecting an interest" defense for the tortious interference claim.  Finally, the trial court should exclude any evidence regarding CSX's operating income as discussed above.  All other issues are affirmed or moot due to the remand.

ALL CONCUR.

BRIEFS FOR APPELLANT CSX
TRANSPORTATION, INC.:

Evan M. Tager
Carl J. Summers
Washington, D.C.

Michael P. Abate
Louisville, Kentucky

BRIEFS FOR APPELLANT CRAIG
HELIGMAN, M.D.:

Brian D. Schmalzbach
Davis Walsh
Richmond, Virginia

Earl L. Martin, III
Rodney D. Payne
Louisville, Kentucky

John L. Bishop
Charlotte, North Carolina

Samuel Tarry
Tysons, Virginia

ORAL ARGUMENTS FOR
APPELLANTS CSX
TRANSPORTATION AND DR.
CRAIG HELIGMAN, M.D.:

Michael P. Abate
Louisville, Kentucky

CO-COUNSEL:

Brian D. Schmalzbach
Richmond, Virginia

BRIEFS FOR APPELLEES:

Stephen G. Amato
David J. Guarnieri
Lexington, Kentucky

ORAL ARGUMENTS FOR
APPELLEES DR. DANIEL J.
CAREY II, D.C. AND SHANNON
JOHNSON, D.C.:

David J. Guarnieri
Lexington, Kentucky

CO-COUNSEL:

Stephen G. Amato
Ken Reed
Lexington, Kentucky