RENDERED: NOVEMBER 15, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0809-MR

BAPTIST HEALTH MEDICAL
GROUP, INC.; AND BAPTIST
HEALTH MADISONVILLE, INC.                        APPELLANTS


APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE SUSAN SCHULTZ GIBSON, JUDGE
ACTION NO. 20-CI-006143


JOHN MITCHELL FARMER, M.D.                        APPELLEE


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: ECKERLE, A. JONES, AND TAYLOR, JUDGES.

ECKERLE, JUDGE: Appellants, Baptist Health Medical Group, Inc. and Baptist

Health, Madisonville, Inc. (collectively, "Baptist Health"), seek review of a

judgment of the Jefferson Circuit Court confirming a jury verdict and award of

damages to Appellee, John Mitchell Farmer, M.D. ("Dr. Farmer"), for breach of

contract and tortious interference with a business relationship.  While we reject Baptist Health's argument that it was entirely immune from suit, we hold that Baptist Health was entitled to a qualified privilege from liability because Dr. Farmer did not show that Baptist Health acted without "good faith" and with "actual malice."  Kentucky Revised Statute ("KRS") 311.6191.

The Trial Court's definition of these terms unreasonably constrained the scope of the statutory exemption and resulted in an undue restriction upon Baptist Health from undertaking discovery and presenting a full picture to the jury. Consequently, the Trial Court deprived Baptist Health of a fair trial by preventing it from giving the jury undisputed, factual evidence supporting its defense of acting in good faith and without actual malice.  Conversely, the Trial Court allowed Dr. Farmer to discover and present the evidence favorable to his side while shielding evidence unfavorable to him.  Given this lopsided presentation, the jury was allowed to render a large award even though there was no evidence to support a jury finding that Baptist Health acted with actual malice or in bad faith.  The Trial Court should have granted a directed verdict and not allowed this case to proceed to verdict.  Hence, we reverse the judgment and remand for entry of an order dismissing Dr. Farmer's complaint.

## I. Factual and Procedural Background

Except where noted, the underlying facts are not in dispute. In 2017, Baptist Health accepted Dr. Farmer into its medical residency program at its Madisonville Family Medicine facility. His residency began on June 30, 2019, for a one-year term, which was supposed to end on June 30, 2020. During the afternoon of November 4, 2019, the mother of two minor patients complained to Stephanie Crick, Baptist Health's facility manager ("Crick"), about Dr. Farmer's behavior. The mother said that she believed that Dr. Farmer was acting strangely, as if he "was on something," because "he was touching his nose a lot and constantly moving from side to side." (Video Record ("VR") 4/27/23, 10:05:38 – 10:09:38; PX 42.) Crick wrote a complaint about the allegation and sent it to Dr. Diana Nims ("Dr. Nims"), director of Baptist Health's residency program.

Upon Crick's report, Dr. Nims consulted with Lori Oglesby, Baptist Health's Executive Director of Human Resources, who explained that as a physician resident, versus an employee, Dr. Farmer would not be subject to discipline. Instead, Oglesby informed Dr. Nims that Baptist Health would counsel Dr. Farmer in an attempt towards recovery and wellness with a view towards patient safety. Dr. Nims then separately discussed the matter with Dr. Kenneth Hargrove and Dr. Douglas Hatler, both of whom regularly worked with Dr. Farmer, including work that same day. Both of the physicians noted Dr. Farmer's

twitchy, restless, and fidgety behavior.  Neither believed that Dr. Farmer was impaired.

Later that evening, Dr. Nims met with Dr. Wayne Lipson, Baptist Health's Chief Medical Officer; Dr. James Armstrong, President of Baptist Health's medical staff and chair of its Medical Executive Committee; Rob Ramey, Baptist's Health's President; and Rhonda Florida, a medical staff administrator. Dr. Nims did not invite Dr. Hargrove or Dr. Hatler to the meeting.  In addition to discussing the complaint at the meeting, the group discussed Dr. Farmer's prior guilty plea to the charge of Driving Under the Influence of an Intoxicant ("DUI"), which he received in 2013 while in medical school.  As a result of that conviction, Dr. Farmer had been referred to the Kentucky Physician's Health Foundation ("the Foundation").  At that time, the Foundation referred Dr. Farmer to a non-mandatory treatment program and evaluation.  Dr. Farmer did not comply with treatment.

Additionally, Dr. Nims told the group about a previous comment that Dr. Farmer had made about suicide, for which she had recommended mental health treatment.  Dr. Farmer had stated that his comment was intended as a joke and no treatment was required.

Dr. Farmer would later assert at trial that he suffers from attention-deficit/hyperactivity disorder ("ADHD"), which causes him to jitter.  He also

claims that his behavior was widely known to the participants hereto, including Crick and Dr. Nims. Crick would later testify that Dr. Farmer's behavior that day was typical for him.

Dr. Nims informed the group that Dr. Farmer was seeing a psychiatrist but did not share that this counseling was for ADHD. Dr. Nims also did not share with the group the opinions of Drs. Hargrove and Hatler that Dr. Farmer was not impaired.

The group noted that they were not poised to determine whether Dr. Farmer was actually impaired. The group discussed all of its options, including drug testing and suspension of privileges. Because the group had no proof that Dr. Farmer was impaired at the relevant time and because any discipline could have serious consequences for Dr. Farmer, the group ultimately decided to re-refer Dr. Farmer to the Foundation. Thus, they did not send Dr. Farmer for immediate testing.

Separately, Dr. Lipson contacted Greg Jones, the medical director of the Foundation. Jones asked about speaking to and testing Dr. Farmer. But Dr. Lipson still did not speak to Dr. Farmer or request testing. Jones was not part of the meeting.

As its purpose, the Foundation identifies and evaluates impaired individuals for diagnosis, treatment, and advocacy. It does not punish or sanction

doctors.  The group decided that, if the Foundation found no impairment or need for treatment, Dr. Farmer would be permitted to return to work immediately with no repercussions.

The following day, Dr. Nims and Dr. Lipson met with Dr. Farmer, told him there had been a complaint alleging impairment the previous day, and directed him to go to the Foundation in Louisville before he would be able to see patients again.  Dr. Farmer asked to be tested immediately, but Baptist Health did not perform any testing.  Dr. Farmer later admitted that he may have consumed alcohol the prior evening, but only after the complaint was lodged and he left work.  Thus, even a positive test performed 24 hours later would not show conclusively that Dr. Farmer was impaired while at work.

Dr. Farmer drove himself to the Foundation, and after meeting with its staff, he was sent to a third-party vendor for testing, as per the Foundation's general practice.  The results of the test, which the Trial Court declined to admit into evidence, did not indicate any contemporaneous impairment.  However, the Foundation's comprehensive testing reflected a very high alcoholic metabolic marker, indicating significant past impairment over the weeks before testing.  That testing indicated both that:  (1) Dr. Farmer may be an alcoholic; and (2) the history he had given Baptist Health was inconsistent with the testing results.  The Trial

Court forbid Baptist Health from discovering anything further about these tests on Dr. Farmer and prevented the jury from receiving this information.

The Foundation referred Dr. Farmer for in-patient evaluation and recommended that he not return to clinical practice until he completed the process. The Trial Court also shielded this information from the jury. Dr. Farmer then attended treatment for three days, where he was diagnosed with alcohol abuse disorder, which is the diagnosis given to approximately 90% of physicians reaching this stage with high metabolic markers and significant, chronic impairment indicating alcoholism. This testing showed alcoholic consumption for weeks before the complaint.

The Trial Court only allowed Baptist Health to inform the jury generally and in conclusionary fashion that Dr. Farmer's test results and information caused the Foundation to report Dr. Farmer to the Kentucky Board of Medical Licensure ("the Board"). On November 15, 2019, Baptist Health separately advised the Board of the Foundation's findings and recommendations. The Trial Court also kept this information from the jury. Thus, the jury only knew that Baptist Health made a disciplinary referral of Dr. Farmer to the Board, but did not know that it did so after a finding of significant impairment of Dr. Farmer that could cause injury to himself, patients, and the public. The jury was likewise kept in the dark about Dr. Farmer's testing, results, DUI, failures to comply with

treatment, and giving false or inconsistent information to Baptist Health about his alcohol consumption.

After conducting its own investigation, the Board issued an order directing that Dr. Farmer was unable to practice medicine safely by reason of alcohol or substance abuse. On November 26, Dr. Farmer signed the order, consenting and agreeing to regular, long-term monitoring. This action, which was reportable to the National Practitioner's Data Bank, specifically noted that Dr. Farmer was unable to practice medicine due to substance abuse. Although it was not required to do so, Baptist Health allowed Dr. Farmer to substitute research electives for patient care to help him by enabling him to complete his residency on time, receive compensation, and be free of suspension or discipline. As per the Board's order, Baptist Health specifically disallowed Dr. Farmer from seeing patients directly.

In mid-December 2019, which was approximately one month after the reported incident, the Foundation sent a letter to Dr. Farmer with some restrictions, subject to which Dr. Farmer would have to agree to abstain completely from alcohol and mood-altering drugs and to submit to random drug tests, individual group therapy, and appointments with a psychiatrist. Dr. Farmer would later claim that this letter prevented him from taking his ADHD medication. Dr. Farmer did not immediately sign it; and thus, Baptist Health did not allow him to return to

work.  Dr. Farmer then exhausted his paid leave.  Subsequently, he took an unpaid leave of absence.  Weeks later, Dr. Farmer finally signed the letter.[1]  The Board's Inquiry Panel removed the restrictions on Farmer's medical license, subject to his agreement to a five-year contract with the Foundation, which required monthly therapist and psychiatrist visits, daily check-ins, and supervised testing.

The parties agree that Dr. Farmer never failed a drug test.  In mid-February of 2020, Dr. Farmer returned to patient care.  In September of 2020, Dr. Farmer completed his residency with Baptist Health.  Had he not taken leave unilaterally, he could have completed it in June.  Importantly, Dr. Farmer never appealed or directly challenged any of the testing, diagnosis, or actions of the treatment providers, the Foundation, or the Board.  The Trial Court would not allow the jury to learn about these undisputed facts, all of which were important to Baptist Health to show its good faith and lack of actual malice, and all of which were harmful to Dr. Farmer's case.

In October 2020, the month after his residency ended, Dr. Farmer brought this action against Baptist Health, asserting claims for breach of contract and tortious interference with a prospective business advantage.  In its answer, Baptist Health asserted a defense under KRS 311.6191, which exempts from

_____

[1]  The parties' briefs on the exact times of the Foundation's and the Board's actions and years-long periods of monitoring are not clear.  However, those timelines are not dispositive of this case.  Therefore, we have discussed this series of events rather generally here.

liability anyone who provides information to the Foundation "in good faith and without actual malice."

Baptist Health moved for summary judgment based upon the exemption provided in the statute. The Trial Court denied the motion, concluding that the statute did not provide blanket immunity from suit. (March 6, 2023, Order, at p. 15.) Rather, it concluded that the statute provided a privilege, which qualified as an affirmative defense. *Id.* As Baptist Health raised that defense, Dr. Farmer had the burden to defeat it by showing that the defense did not apply under the circumstances of the case. *Id.* Thus, the Trial Court ruled that there were genuine issues of material fact concerning Baptist Health's good faith and actual malice, and the matter should proceed to a jury trial. *Id.* Baptist Health appealed that interim ruling to this Court.

In the first appearance of this case before this Court, Baptist Health submitted a motion for intermediate, urgent relief pursuant to Kentucky Rule of Appellate Procedure ("RAP") 21 to be decided by only one Court of Appeals Judge. In the initial order, this Court denied intermediate relief, noting that the Trial Court's Order did not contain the requisite finality language, which would have made it final and appealable under Kentucky Civil Rule of Procedure ("CR") 54.02. *Baptist Health Medical Group, Inc. v. John Mitchell Farmer, M.D.*, No. 2023-CA-0306-MR (Ky. App. Apr. 4, 2023) at pp. 4-5. A denial of summary

judgment, as opposed to a grant, would not ordinarily end litigation and would not do so specifically in this case, as a jury trial was to ensue. The Order further noted that the defendants in the suit, which did not include the Board, did not file motions to dismiss on immunity grounds and instead proceeded with some discovery, thereby undercutting their own claims that they were to be free from "the burdens of trial." *Id.* at p. 6.[2] The Order concluded that Baptist Health had not met its "onerous burden" of showing immediate injury and irreparable harm. *Id.* This Court made no decision on Dr. Farmer's separate pending motion to dismiss as interlocutory. *Id.* at p. 7.

Subsequently, in the second trip to this Court, and on Dr. Farmer's motion to dismiss, the full motion panel of three Judges of this Court decided that the Trial Court's order, holding that questions of fact remained as to Baptist Health's alleged bad faith and actual malice, was interlocutory, went directly to the merits, and was not appealable. *Baptist Health Medical Group, Inc. v. John Mitchell Farmer, M.D.*, No. 2023-CA-0306-MR (Ky. App. Apr. 10, 2023) at p. 3. This Court concluded that Baptist Health's defense of immunity, or privilege, would not be successful if the jury found bad faith and actual malice, thus necessitating findings of fact by a jury. *Id.* at p. 6. Accordingly, the panel found that the statute may provide protection from liability, but not immunity from suit.

---

[2] The motions of the Foundation and the Board to intervene were pending at that time.

*Id.* at pp. 7-8. "Whether couched as providing immunity from liability or a defense to liability, the statute contemplates that actions containing these allegations will and may be filed." *Id.* at p. 8 (footnote omitted). Accordingly, this Court granted the motion to dismiss the appeal and remanded the case back to the Trial Court for proceedings to determine any liability. *Id.* at p. 10. Upon further appeal to the Kentucky Supreme Court, emergency intermediate relief was again denied. *Baptist Health Medical Group, Inc. v. John Mitchell Farmer, M.D.*, No. 2023-SC-0163-I (Ky. Apr. 24, 2023).

The parties attempted to engage in discovery prior to the looming April 25, 2023, trial. Baptist Health sought discovery of Dr. Farmer's extensive testing, evaluation, and treatment records. Dr. Farmer refused, arguing that the records were privileged under KRS 311.619, which provides some protection for treatment records of licensed and potentially impaired physicians. In orders entered on March 24, 2023, the Trial Court granted Dr. Farmer's motion for a protective order, concluding that records created or controlled by the Foundation were privileged under KRS 311.619 and Kentucky Rule of Evidence ("KRE") 507. The Trial Court further concluded that Dr. Farmer's filing of a lawsuit claiming improper treatment by Baptist Health had not waived his privilege regarding the treatment that he had received. The Trial Court also found that the treatment records were not relevant to Dr. Farmer's claim arising from Baptist Health's

decision to refer him to the Foundation for treatment. It ruled that the sole, narrow issue for the jury to decide was whether Baptist Health acted in good faith and without actual malice at the limited time of the referral. It rejected Baptist Health's argument that the treatment records provided proof of its lack of bad faith and actual malice, and it forbade the use of those records in Baptist Health's defense.

The Trial Court further granted Dr. Farmer's motion *in limine* to exclude evidence and prevent Baptist Health from making arguments about a whole host of other factual issues related to its defense of good faith and lack of actual malice. The Trial Court's exclusion of vast swaths of evidence favorable to Baptist Health and unfavorable to Dr. Farmer included the reasons for the referral to treatment, facts underlying the diagnosis, past history, chronic alcohol abuse, agreements to receive treatment, failures to comply with treatment, unexplained leaves of absence from work, lack of dispute or appeal for the actions taken, test results, reports, and dangers to patients, the public, and Dr. Farmer himself. The Trial Court generally suppressed all of Baptist Health's proof by shockingly concluding that this evidence was not relevant to Baptist Health's good faith and actual malice at the precise time that it made the referral.

The Trial Court further rejected Baptist Health's proposed stipulations of undisputed factual evidence. Instead, it permitted Dr. Farmer to advise the jury in general that the Foundation relied on amorphous test results to refer Dr. Farmer

-13-

for evaluation, and those actions served as a basis for the Board's investigation and disciplinary process. And yet, the Trial Court curiously found that those results and reports were relevant to the question of damages. The Trial Court did not allow Baptist Health to present specific factual evidence or argument to the jury as to the issue of Baptist Health's liability for any damages. Consequently, The Trial Court did not allow the jury to see the full picture of Baptist Health's attempts to get help for Dr. Farmer or the undisputed factual bases for its decision to refer him to the Foundation.

In other words, the Trial Court omitted virtually all of the critical information about Dr. Farmer from the abridged version of his history for the jury, which did not hear the complete story. Instead, the jury was only given some of the actions that Baptist Health had taken, without any context or explanation. The Trial Court's rulings crippled Baptist Health's case and deprived it from presenting any meaningful defense. Given this one-sided narrative, the jury's ultimate and substantial verdict was virtually guaranteed.

Baptist Health moved for a directed verdict at the close of Dr. Farmer's proof, and again at the close of all of the evidence, but the Trial Court denied those motions. Neither Dr. Farmer nor the Trial Court gave a detailed explanation of what facts could possibly support a finding of Baptist Health's bad faith or actual malice.

At the conclusion of the April 25 through May 2, 2023, trial, and after hearing only select portions of the facts of the case that were damning to Baptist Health, the jury returned verdicts for Dr. Farmer on both counts, awarding Dr. Farmer $236,044.00 for breach of contract and combined damages of $3,500,000.00 for tortious interference with Dr. Farmer's business relationship with the Board and prospective future employers. The Trial Court subsequently denied Baptist Health's motions for judgment notwithstanding the verdict and for a new trial. This appeal followed. Additional facts will be set forth below as necessary.

## II.   Analysis

Unlike the procedural issues raised in the prior two appellate proceedings regarding irreparable injury and interlocutory orders, the primary issue in this appeal squarely concerns the merits of Baptist Health's claim of immunity or exemption from liability under KRS 311.6191. The related questions concern whether the Trial Court properly defined the terms "bad faith" and "actual malice" under the statute, and whether Baptist Health was allowed to and did establish its good faith and lack of actual malice.

### A.   Application of KRS 311.6191

We begin with the text of KRS 311.6191, which addresses treatment for impaired physicians and provides as follows:

Any member of the impaired physicians program created under KRS 311.616, as well as any administrator, staff member, consultant, agent, or employee of the program acting within the scope of his or her duties and without actual malice, and all other persons who furnish information to the program in good faith and without actual malice, shall not be liable for any claim or damages as a result of any statement, decision, opinion, investigation, or action taken by the program, or by any individual member of the program.

In turn, KRS 311.616 authorized the Board to establish the Foundation "to promote the early identification, intervention, treatment, and rehabilitation of individuals licensed by the board who may be impaired by reason of illness, alcohol or drug abuse, or as a result of any physical or mental condition." KRS 311.616(1). A referral allows the Foundation to intervene early before a physician's condition results in harm to patients and the public. To that end, and by its terms, KRS 311.6191 exempts from liability any person who furnishes information to the Foundation in good faith and without actual malice. Thus, parties who furnish information to the Foundation will not ordinarily be liable for civil claims based upon such referrals. However, liability can be found where there is both actual malice and lack of good faith.

Prior to oral argument, this Court granted the motion by the Foundation and the Board to file an *Amici Curiae* brief. The Foundation and the Board jointly assert that the Trial Court's interpretation of KRS 311.6191 is flawed. They also assert that the Trial Court's holding imperils the public

-16-

protection interest in the "early identification, intervention, treatment and rehabilitation of individuals licensed by the board who may be impaired by reason of illness, alcohol or drug abuse, as a result of a physical or mental condition." The Foundation and the Board maintain that the Trial Court's ruling chills hospitals, colleagues, and others from fulfilling reporting obligations required by law. Thus, the Foundation and the Board argue that the Trial Court's interpretation of KRS 311.6191 undermines their ability to carry out their statutory functions effectively. We have considered these arguments and interests in reaching our conclusion.

Dr. Farmer first argues that KRS 311.6191 only applies to his tortious interference claims and not to his breach-of-contract claim. We disagree. The statute clearly provides that a party who furnishes information to the Foundation without actual malice "shall not be liable for *any claim or damages* as a result of any statement[.]" (Emphasis added.) This language broadly precludes liability for all claims arising from the referral, including for breach of contract.

### B.     Immunity from Suit vs. Defense from Liability

As stated above, the two Opinions of this Court in the prior appeals noted Baptist Health's argument that the statute affords immunity from suit entirely and not merely an affirmative defense to liability. Indeed, the language of the statute itself specifically grants some protection to parties that provide

information to the Foundation. Whether that protection is phrased as immunity, privilege, or a defense to liability, we clearly held that "the statute's protections do not extend to statements made in bad faith or with actual malice." *Baptist Health v. Farmer*, Order Dismissing at p. 8. And a showing at trial of actual malice and lack of good faith would defeat any claim or defense of immunity from liability. Absent evidence of lack of actual malice and good faith, absolvement from liability would only ensue at trial, and not beforehand.

"Immunity" is generally understood as an exemption from liability, while a "privilege" pertains to the admissibility of certain evidence in legal proceedings where liability remains a potential outcome. *See Maggard v. Kinney*, 576 S.W.3d 559, 566-67 (Ky. 2019). Although sometimes casually referred to as providing immunity from civil suit, a privilege actually precludes the use of those communications to sustain a cause of action. *Id.* at 567 (citing *Halle v. Banner Industries of N.E., Inc.*, 453 S.W.3d 179, 184 (Ky. App. 2014)). In this case, KRS 311.6191 exempts from liability certain communications made to the Foundation, thus implicating doctrines of immunity and privilege.

However, and somewhat unhelpfully, the statute does not use either the term "immunity" or "privilege." Likewise, the case law does not always clearly delineate between immunity and privilege. However, in *Sisters of Charity Health Systems, Inc. v. Raikes*, 984 S.W.2d 464 (Ky. 1998), the Kentucky Supreme

Court analyzed the language in KRS 311.377, which provides that any person who is granted staff privileges by a health services organization shall be deemed to have waived any claim of damages arising when the organization furnishes information in good faith to any governmental or quasi-governmental credentialing agency. The Supreme Court characterized that statute's verbiage as creating a qualified privilege for peer-review material, but only between the contracting medical personnel and the health organization. *Id.* at 469-71.[3]

Similarly, in *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014), the Kentucky Supreme Court recognized a qualified privilege for certain communications. *Id.* at 282. This time, it addressed whether such a privilege offered immunity from suit in the context of an analysis of good faith and actual malice arising from defamation *per se*:

> The qualified privilege is just that: qualified. Not an absolute defense, the privilege's protection can be lost through unreasonable actions amounting to abuse. Indeed, the party asserting a qualified privilege may still be responsible for falsehoods if both actual malice and falsity are affirmatively shown. The qualified privilege operates to allow defendants the necessary latitude to communicate freely while maintaining accountability when the defendant operates outside of or contrary to the privilege. In this context, accordingly, *actual malice*

---

[3] In *Shure v. Ford*, No. 2011-CA-000144-MR, 2012 WL 1657133 (Ky. App. May 11, 2012) (unpublished) (cited pursuant to RAP 41(A)), a panel of this Court also interpreted the language in KRS 311.377, as discussed in *Raikes*. The panel ultimately concluded that the statute creates a qualified immunity for communications made in good faith and without actual malice. *Id.* at *5-7.

> refers to "malice in fact" – read: malevolence or ill will.
> A defendant who enjoys the qualified privilege may
> make defamatory statements, "unless maliciously
> uttered." Our case law and the relevant treatises – by
> focusing on the utterance of the defamatory statement
> rather than its veracity – evidence this distinction. With
> the qualified privilege, it is not so much what was said as
> it is how it was said. After all, the qualified privilege
> will provide protection despite a statement's falsity,
> assuming, of course, the privilege is not abused.

*Id.* at 283-84 (footnotes omitted). Thus, the analysis in *Toler* applies the term "privilege" as a protection from liability from a claim, and not an absolute immunity from suit. Its reasoning applies logically to cases outside of the context of defamation law, such as this one, which revolve around evidence of bad faith and actual malice. Consequently, the party asserting a qualified privilege may still be responsible for falsehoods if both actual malice and falsity or lack of good faith are affirmatively shown by a plaintiff. *Id.*

In this case, we must now address the distinction between immunity and privilege, and the meaning of qualified privilege in a section of KRS Chapter 311 other than cited in *Raikes* and *Shure*. The language of KRS 311.6191 clearly indicates that the General Assembly intended to provide qualified protection from liability to parties who furnish information to the Foundation unless a plaintiff affirmatively shows both bad faith and actual malice.[4] *Toler*, 458 S.W.3d at 283.

---

[4] We recognize that the term "qualified immunity" often refers to the doctrine of "qualified official immunity," which is the immunity from tort liability afforded to public officers and

In its March 6, 2023, order denying Baptist Health's motion for summary judgment, the Trial Court recognized that Dr. Farmer had the burden to establish these elements, and that he could only do so by engaging in factual discovery. Accordingly, dismissal on absolute immunity or privilege grounds prior to fact-finding at trial by a jury was unwarranted. Rather, Dr. Farmer's burden of proof on summary judgment was subsumed within his ultimate burden of proof at trial. There appears to be no other way to establish actual malice and bad faith, or the lack thereof, other than presenting such evidence at a trial before a fact-finder. Any other holding, *i.e.*, preventing the case from proceeding to trial, would render meaningless the requirements of showing evidence of actual malice and bad faith to escape immunity, privilege, or other protection. That being said, the Trial Court must still address this evidence before it sends the case to a jury – in the form of directed verdict motion practice at the close of a plaintiff's case or the close of all of the evidence at trial. Judgements notwithstanding the verdicts likewise remain on the table, and can only be made *after* hearing all of the evidence.

---

employees for acts performed in the exercise of their discretionary duties. *Patton v. Bickford*, 529 S.W.3d 717, 723 (Ky. 2016). Because this case does not involve a public officer or employee, that doctrine is inapplicable here. However, in this case, we use the term "qualified immunity" to describe a statutory immunity that is not absolute, but conditional (or qualified) upon findings of a lack of good faith and actual malice.

## C. Good Faith and Actual Malice

To establish liability at trial, Dr. Farmer was required to meet his burden of proving at trial Baptist Health's lack of good faith and actual malice. Dr. Farmer contends that he could meet his burden by presenting evidence either that Baptist Health acted in bad faith or with actual malice. We disagree, noting that the express language of KRS 311.6191 clearly requires a showing that Baptist Health did not act in good faith *and* with actual malice. Moreover, acting with malice and acting in good faith are mutually exclusive. *Martin v. O'Daniel*, 507 S.W.3d 1, 5 (Ky. 2016). Thus, both showings are required.

Furthermore, *Toler*, *supra*, recognized that the party seeking to defeat a qualified privilege cannot merely assert that the information was false or misleading; doing so alone should lead to a directed verdict. *Toler*, 458 S.W.3d at 285. Rather, it was Dr. Farmer's burden here to present some evidence that would incline a reasonable person to believe that Baptist Health's referral "was not simply the product of mistaken observation, but the result of malice, *i.e.*, some evidence that [Baptist Health] knew [Dr. Nims] was lying or making wholly unfounded statements without regard to their truth or falsity." *Id.* at 285-86 (quoting *Harstad v. Whiteman*, 338 S.W.3d 804, 813 (Ky. App. 2011)).

There is some dispute over the type of malice that Dr. Farmer was required to prove. Baptist Health argues that the Trial Court circumscribed too

narrowly the definitions of "actual malice" and "good faith," focusing only on the definition of "malice" in KRS 411.184(1)(c) regarding punitive damages, which were not requested in this case.[5] It claimed that this limitation led to the improper exclusion of evidence by only allowing introduction of information as to whether Baptist Health specifically intended to cause harm to Dr. Farmer at the time the report to the Foundation was made. It notes that the Trial Court failed to incorporate the objective standard of reasonableness. And this failure allegedly caused the Trial Court to exclude further certain evidence that ought to have been allowed.

KRS 311.6191 specifically uses the term "actual malice." As with public figures, the public purpose component of KRS 311.6191 seeks to promote discussion and open communication – here, with the Foundation. In this case, the statute serves to protect doctors, patients, and the general public at large by providing information to enable treatment for physicians who need it and would otherwise do harm. Therefore, we conclude that the Trial Court improperly

---

[5] The Trial Court used the term "great" to qualify "indifference." *See also Stearns Coal Co. v. Johnson*, 238 Ky. 247, 252, 37 S.W.2d 38, 40 (1931). Baptist Health wanted the "indifference" to be "complete," "flagrant," or "reckless." (Appellant Brief, at p. 20.) But we need not delve into the propriety of the Trial Court's novel use of punitive damages language in the jury instructions in this case because the case should have never gone to a jury, and the jury should never have been instructed. Our ruling that Dr. Farmer did not tender any evidence of actual malice no matter how that term is defined should not be read as countenancing the instructions that the Trial Court gave in this case.

applied the "malice" definition used for determining punitive damages to limit evidence, when it should have used the "actual malice" standard in the statute. "Actual malice" requires "more than mere negligence," and it "must be shown by clear and convincing evidence." *Welch v. Am. Publ'g Co. of Kentucky*, 3 S.W.3d 724, 727-28 (Ky. 1999). This standard was specifically designed to be a difficult one to meet, precisely because of the important policy reasons behind the statute itself – to obtain treatment for impaired doctors and prevent harm to their patients.

Dr. Farmer contends that actual malice may be inferred from Baptist Health's failure to follow the Drug Testing Policy in its Resident's Manual by collecting blood or urine samples immediately after the complaint was filed. Instead, Baptist Health referred Dr. Farmer to the Foundation for testing the following day, resulting in a 24-hour delay.

Under the "actual malice" standard, Baptist Health's mere, alleged negligence in failing to follow its written policies prior to making a referral does not alone constitute bad faith or actual malice within the meaning of KRS 311.6191. Likewise, Baptist Health's alleged negligence in conducting the investigation prior to referring the matter does not give rise to liability for actual malice. Baptist Health did refer Dr. Farmer to the Foundation, and Dr. Farmer was tested the day after the complaint. If it had referred him the day before, such referral would still have been well after the incident, and Baptist Health was

-24-

concerned that positive results would reflect impairment subsequent to the treatment of patients. This concern was objectively reasonable, given Dr. Farmer's own admission that he might have consumed alcohol upon returning home immediately after the complaint. And, it shows that Baptist Health was actively trying not to harm Dr. Farmer. Moreover, the referral proved to be substantiated. Although Dr. Farmer may not have been intoxicated on the day of the incident, the comprehensive testing revealed chronic alcohol abuse, indicating that Baptist Health had good reason for the referral. And still, there is no evidence that Dr. Farmer was or was not impaired at the time of the incident.

With regard to Dr. Farmer's DUI, Baptist Health knew of his conviction because he was required to submit it in his application. And Dr. Farmer's willful failure to follow the Foundation's earlier treatment plan for the DUI is relevant to Baptist Health's defense of good faith in making the subsequent referral.

In its investigation, Baptist Health documented its concerns, and after significant discussion about all available options, the group specifically decided to refrain from punishing or disciplining Dr. Farmer. It called for testing to determine whether there was even a problem, and if so, whether treatment was warranted. There is no evidence that Baptist Health sought testing as a means of suspending or otherwise taking actions harmful to Dr. Farmer. To the contrary, the evidence

showed that if Dr. Farmer's testing did not reveal his impairment, Baptist Health would not mandate any treatment. But the testing in fact showed the exact opposite – significant impairment that needed treatment. And the Trial Court prevented the jurors from hearing this evidence while at the same time impaneling them for the purpose of rendering a decision about Baptist Health's motives in making a referral based upon scientific testing.

Furthermore, Baptist Health's referral to the Foundation and its subsequent, third-party testing results validated the group's concerns and showed a good faith foundation for the initial complaint from the two patients' mother, as well as for Baptist Health's ensuing suspicions and actions. Regardless of any impairment at the time in question, the testing showed chronic alcohol abuse and Dr. Farmer's provision of inaccurate information about his alcohol consumption to Baptist Health. This information goes directly to Dr. Farmer's credibility, which is always at issue with any witness at trial, particularly a plaintiff with a burden of proof, such as here. But except for the very limited stipulation that vague testing led to the disciplinary proceedings by the Board, the Trial Court did not admit of any of this information. Because Baptist Health's defense and claim of immunity and privilege relied necessarily upon the sole grounds of good faith and lack of malice, the Trial Court's severe constriction of evidence was undue.

Compounding this error, while the Trial Court leveled improper evidentiary curbs upon Baptist Health, it allowed Dr. Farmer unfettered leeway to attempt to show bad faith and actual malice. And it accepted at face value Dr. Farmer's claim that he had such evidence that was sufficient to present to a jury. Yet, the proof he proffered was shockingly thin.

As to any improper motive of Baptist Health, at most, Dr. Farmer contends that Dr. Nims had personal, and potentially failed romantic, issues with him, leading her to fail to disclose her prior discussions with Drs. Hargrove and Hatler to the group. He believes, without providing any evidence, that Dr. Nims' nondisclosure was motivated by her supposed, unrequited love crush on him. What he did not show was that if Baptist Health had been made aware that Drs. Hargrove and Hatler did not believe that Dr. Farmer had been impaired that day, Baptist Health would have acted any differently. Quite the opposite, the undisputed proof showed that Baptist Health correctly assessed the concerns about Dr. Farmer's chronic impairment, and those suspicions were substantiated by scientific tests. Baptist Health did not sanction Dr. Farmer; it referred him for testing and potential treatment based upon the information it had at the time. Had that information included the opinions of Drs. Hargrove and Hatler, the result may have been no different. Baptist Health was seeking answers at that stage, not

levying punishment. And Dr. Farmer did not present evidence that Drs. Hargrove and Hatler were opposed to having Dr. Farmer tested.

Even if Dr. Nims had desires for Dr. Farmer that he did not share, he did not make the connection to establishing bad faith and actual malice on the part of Baptist Health for referring him to treatment. And even with the allegedly omitted information, there was no evidence that Baptist Health's concerns about Dr. Farmer were so lacking in merit as to be objectively unreasonable. More important, the Trial Court allowed the jury to speculate improperly that Dr. Nims set out to harm Dr. Farmer because the Trial Court refused to allow any of the abundant motive evidence that Baptist Health had legitimate, accurate, well-founded, and good-intentioned reasons to look into Dr. Farmer's suspected impairment. In a search for the truth, a trial jury cannot be given only one-half of the story.

Here, all of the testing only suggested that Dr. Farmer was not impaired at some point after the complaint against him had been lodged. Baptist Health through its employees did not initiate the complaint; the mother of two patients did based upon Dr. Farmer's suspicious behavior. Nonetheless, the Trial Court did not allow Baptist Health to present to the jury any reasonable basis for it to believe that Dr. Farmer was impaired at the time of the incident. And, the Trial Court did not permit the jury to hear of other, undisputed, chronic impairment.

And yet even the minimal evidence that the Trial Court did authorize the jury to hear showed no intent whatsoever on the part of Baptist Health to cause wrongful injury to Dr. Farmer.

The "actual malice" standard required Dr. Farmer to present evidence showing that Baptist Health either knew the information that it provided to the Foundation was false or that it made the referral with reckless disregard of whether the information was true or false.[6]  *Toler*, *supra*, at 289.  Here, Dr. Farmer merely and speculatively claims that Dr. Nims failed to disclose information that might have led to a decision different from referring him to the Foundation.  He did not show that Dr. Nims' alleged, ulterior motivations demonstrated knowledge of falsity or a disregard of the truth or falsity of the information by Baptist Health.  He also did not show that referring a chronically impaired doctor for treatment was some sort of a revenge scheme here.  Likewise, Dr. Farmer did not submit any evidence that Baptist Health intended to cause injury by having Dr. Farmer assessed.  And again, Baptist Health was not allowed by the Trial Court to show that the information was true and that its actions were justified by the testing results.  In seeking to defeat a qualified privilege, Dr. Farmer cannot merely assert

---

[6]  Even under the definition of the terms used in Trial Court's instructions, Baptist Health was precluded from showing relevant evidence of good faith and lack of malice by introducing facts that it acted with justification and excuse or specifically did not intend to cause injury.

that the information was false or misleading, and doing so alone should have lead the Trial Court to grant a directed verdict. *Toler*, 458 S.W.3d at 285. Dr. Farmer had the burden to show some evidence that would incline a reasonable person to believe that Baptist Health's referral "was not simply the product of mistaken observation, but the result of malice, *i.e.*, some evidence that [Baptist Health] knew [Dr. Nims] was lying or making wholly unfounded statements without regard to their truth or falsity." *Id.* at 285-86 (quoting *Harstad v. Whiteman*, 338 S.W.3d 804, 813 (Ky. App. 2011)). He made no such showing.

Moreover, any determination of Baptist Health's lack of good faith and actual malice in making the referral cannot be divorced from the outcome of the Foundation's testing or the Board's investigation. To the contrary, the primary purpose behind the referral process is to allow the Foundation to intervene early before a physician's condition results in harm to patients, the physician, or the public. This process necessarily anticipates that a medical employer may refer a physician based upon concerns arising before there is a clear showing that the physician is actually impaired. And the process allows the Foundation to make its own determination whether the concerns are substantiated. It was not required to accept the unsubstantiated lay opinions of Drs. Hargrove and Hatler as to Dr. Farmer's sobriety. And importantly, Baptist Health could have referred Dr.

Farmer to the Foundation based solely on the complaint alone and could have done so in good faith without any input from any doctor.

As the Foundation and the Board compellingly argue, the very process anticipates a "good faith" referral. Even the limited evidence that the Trial Court allowed the jury to hear is entirely devoid of proof that Baptist Health lacked good faith and acted with actual malice. However, Baptist Health was not permitted to counteract Dr. Farmer's implications of malice with evidence that the Foundation and the Board substantiated its concerns.

Indeed, the uncontroverted proof showed that at least some injury to Dr. Farmer resulted from his own alcohol consumption. Once Baptist Health had a reasonable basis to suspect impairment, it was required to report it. *See Norton Hospitals, Inc. v. Peyton*, 381 S.W.3d 286, 292 (Ky. 2012), addressing a similar immunity for reporting child abuse under KRS 620.050(1). Furthermore, a referral to the Foundation is not disciplinary. And Dr. Farmer did not prevail upon the Foundation to find no need for him to seek treatment.

Dr. Farmer admits that Baptist Health was entitled – and maybe required – to investigate the reported complaint against him. He admits that the results of the Foundation's testing led it to refer the matter to the Board. He likewise concedes that the Foundation was likely required to make a report to the Board, and that the Foundation's action did not constitute a disciplinary referral.

Dr. Farmer also admits that the Board imposed restrictions on him based on the outcome of an independent investigation. Both the Foundation and the Board determined that Baptist Health's concerns were substantiated. Dr. Farmer had the chance to convince the Foundation and the Board that he did not need treatment. He failed. While the Trial Court ruled that the records of the Foundation's testing and investigation were not discoverable or admissible, the results alone – which the Trial Court did allow – are highly relevant to the question of actual malice. And they showed that at least some of Dr. Farmer's claimed injuries were caused from his own alcohol consumption. In order to defend itself, Baptist Health should have been allowed to present evidence that showed that it could have in good faith foreseen that Dr. Farmer's test results would be so high, and thus that it could not have acted with bad faith or actual malice in making the referral. If the test results had been negative, and then Baptist Health took actions against him, maybe a case for malice could be made. But that did not occur here. Baptist Health must rightfully be concerned about an impaired doctor committing malpractice and hurting someone both for the harm itself and for its malpractice implications and potential awards.

And Dr. Farmer clearly placed his treatment at issue here by the allegations that he made in his suit. His medical treatments, diagnoses, and history, at least as far back as the incident that gave rise to this litigation are highly

relevant. A Trial Court can always make admonishments to the jury about the evidence, as necessary. That was not done here.

But aside from the Trial Court's improper exclusion of Baptist Health's evidence of good faith and lack of actual malice, we must stress again that the important factor here is that the Trial Court did not receive any real evidence from Dr. Farmer of Baptist Health's bad faith and actual malice. Instead, it allowed the case to proceed to jury verdict solely upon the basis of innuendo, assumptions, and speculation. As discussed above, KRS 311.6191 placed the burden of proof on Dr. Farmer to show that Baptist Health referred him to the Foundation in bad faith and with actual malice. The sufficiency of his evidence was directly before the Trial Court on Baptist Health's motion for directed verdict.

A Trial Court may direct a verdict on an issue when there was a "complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Bierman v. Klapheke*, 967 S.W.2d 16, 18-19 (Ky. 1998). *See also* CR 50.01. In making this determination, the Trial Court must "admit[] the truth of all evidence which is favorable to the party against whom the motion is made." *National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988). The Trial Court may not consider the credibility or weight of the proffered evidence, because "if there is conflicting evidence, it is the responsibility of the jury, the trier of fact, to

resolve such conflicts." *Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 215 (Ky. App. 2009) (citing *Hornung*, 754 S.W.2d at 860).

Here, and we must emphasize at the very most, Dr. Farmer had this evidence: his failure to be tested immediately after the complaint and his uncorroborated assertion that Baptist Health acted in bad faith because Dr. Nims failed to present the opinions of Drs. Hargrove and Hatler to the group because Dr. Farmer would not engage in a personal relationship with her. We have already explained these deficiencies in this Opinion. Testing Dr. Farmer after the complaint would not necessarily have shown impairment at work and may have improperly shown impairment that occurred after work. Regarding the second point, Dr. Farmer's bald supposition of unrequited attention alone does not constitute bad faith or actual malice under any conceivable standard. The assertion that information is misleading by omission is simply not enough to survive a directed verdict motion in a case of qualified privilege. *Toler*, 458 S.W.3d at 285. Even if Dr. Nims should have given the group the opinions of Drs. Hargrove and Hatler, and even if she withheld it improperly, and even if the group might have relied upon it, there is still no sufficient evidence of actual malice. There was no evidence to suggest that Baptist Health was required to reject the other, significant concerns about Dr. Farmer and decline to refer the matter to the Foundation for further investigation. And there was no evidence that Baptist Health acted in bad

faith or with actual malice for doing so. Likewise, there was no evidence that Baptist Health knew that Dr. Nims was withholding information, lying, or making unfounded statements without regard to their falsity.

Indeed, the evidence showed that Baptist Health acted with some good faith in taking Dr. Farmer's interests into account and helping him to complete his residency promptly by substituting electives other than seeing patients. Dr. Farmer did not show that the information that Baptist Health provided to the Foundation was false or materially misleading, or that Baptist Health knew that it was. Dr. Farmer also did not show that Baptist Health intended to cause injury to him in violation of his clearly established rights.

The purpose and clear language of KRS 311.6191 affords a broad, albeit qualified, exception from liability to parties who furnish information to the Foundation. This exemption will be abrogated only upon a plaintiff's clear showing that a defendant was not acting within the scope of his duties, was not acting in good faith, and was acting with actual malice. In this case, there was a complete absence of proof on the material issue of actual malice.

In short, Dr. Farmer abjectly failed to meet his burden of showing some evidence of either bad faith or actual malice on Baptist Health's part. Given the dearth of evidence on these two required elements, the Trial Court should not have allowed this case to go to the jury. Having no evidence of bad faith or actual

malice, the Trial Court was required to grant a directed verdict at the close of Dr. Farmer's case.

As noted above, the Foundation and the Board each conducted their own inquiries, finding Baptist Health's concerns to be substantially justified. Even more significantly, Dr. Farmer agreed to the Board's conditions and long-term supervision by the Foundation. While Dr. Farmer now complains he was forced to accept those conditions, he cannot use this action to cast doubt on the validity of his agreements with the Foundation and the Board. And those binding agreements would necessarily preclude a finding that the information that Baptist Health provided to the Foundation was false or materially misleading, or that it acted with reckless disregard of the truth or falsity of that information. Thus, Dr. Farmer cannot establish that Baptist Health acted with actual malice in making the initial referral to the Foundation. Therefore, we must conclude that Baptist Health was entitled to a directed verdict based upon the provisions of KRS 311.6191. The Trial Court abused its discretion by sending this case to this jury, who we must re-emphasize, was improperly prevented from hearing all of the critical evidence relevant to Baptist Health's defense. One side of a case alone without the other side necessarily tips the scales. The verdict resulting from this unbalanced

presentation and exclusion of evidence cannot stand, and the Trial Court should not have allowed the case to get this far.[7]

### D. Other Issues

Even if Baptist Health were not entitled to a directed verdict based on the lack of a showing of bad faith and actual malice, we would still conclude that the Trial Court erred by allowing Dr. Farmer's claim for tortious interference to proceed to the jury. Dr. Farmer clearly does not have a business relationship with the Board.

As its statutory obligation, the Board must "regulate, control and otherwise discipline the licensees who practice medicine and osteopathy within the Commonwealth of Kentucky." KRS 311.555. In KRS Chapters 13B and 311, the legislature set forth a comprehensive framework for the Board's conduct in those matters. *See Kentucky Bd. of Med. Licensure v. Strauss*, 558 S.W.3d 443, 448-50 (Ky. 2018). Dr. Farmer's relationship with the Board is governed by the framework. Given the Board's express statutory mandate, we agree with Baptist Health that Dr. Farmer does not have an actionable business or profit relationship or expectancy with the Board, and the two do not have an aligning, voluntary, economic interest. The tort simply does not encompass their relationship.

---

[7] For the same reasons, the Trial Court should have granted a judgment notwithstanding the verdict when it was again confronted with a complete dearth of evidence of bad faith and actual malice.

-37-

Likewise, and in any event, the alleged injury to Dr. Farmer's relationships with prospective future employers, and the alleged contract breach, were caused by the disciplinary actions of the Board – if not by Dr. Farmer himself – but not from Baptist Health's actions of non-disciplinary referral to the Foundation. Similarly, Dr. Farmer's alleged injury from the breach of contract arose from the actions taken by the Foundation and the Board, not Baptist Health. And as noted above, Dr. Farmer failed to complete his residency on time only because he failed to sign agreements before he exhausted his excused absences and unilaterally left, taking unpaid leave. Dr. Farmer made no showing that his alleged rupture of business relationships was caused by Baptist Health's allegedly wrongful actions. Dr. Farmer cited to no authority to support this cause of action, and the Trial Court should not have allowed it to proceed. Even if the claims were not otherwise precluded by protection from liability under KRS 311.6191, Baptist Health would still have been entitled to pre-trial dismissal of the tortious interference claim.

As discussed above, Dr. Farmer placed the truth or falsity of the matters relating to Baptist Health's initial referral of him to the Foundation. Thus, it would appear that he waived any privilege to which he was entitled under KRS 311.619. Similarly, the Trial Court abused its discretion by excluding evidence of the subsequent actions taken by the Foundation and the Board. However, since we

have concluded that Baptist Health was entitled to dismissal of Dr. Farmer's claims, those issues are now moot. Similarly, any question about excessiveness of the jury's damages award is now moot, as that award is vacated by the reversal.

## III. Conclusion

Accordingly, we reverse the judgment of the Jefferson Circuit Court, and we remand this matter for entry of a directed verdict dismissing Dr. Farmer's claims.


ALL CONCUR.

BRIEFS FOR APPELLANTS:

Bethany A. Breetz
Louisville, Kentucky

Jeffery T. Barnett
Robert J. Benvenuti, III
Holly R. Iaccarino
Lexington, Kentucky

BRIEF FOR *AMICUS CURIAE*:

Leanne K. Diakov
Louisville, Kentucky

Michael J. O'Connell
Louisville, Kentucky

ORAL ARGUMENT FOR
APPELLANTS:

Bethany A. Breetz

BRIEF FOR APPELLEE:

Marvin L. Coan
David L. Sage
Louisville, Kentucky

Kathleen A. DeLaney
Indianapolis, Indiana

ORAL ARGUMENT FOR
APPELLEE:

Kathleen A. DeLaney